UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(West Palm Beach Division)

FILED BY ___ hal ___ D.C.

JUL 3 1 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

| | |
|---|---|
| STEVEN LEWIS SCESA, individually, and as Settlor and Sole Lifetime Beneficiary of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021, ) ) ) ) ) | CASE NO. |
| Plaintiff, ) ) | |
| v. ) ) | DEMAND FOR JURY TRIAL |
| KEITH D. SLOCUM, an individual; SLOCUM LAW; TIMOTHY W. SCHULZ, an individual; TIMOTHY W. SCHULZ, P.A.; GENE A. TURK, JR., an individual; LAW OFFICE OF GENE TURK; and JEFFREY TYLER SMITH, individually, and as Former Trustee of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021, ) ) ) ) ) ) ) ) ) ) | JUDGE<br><br>Action Filed Pursuant to 18 U.S.C. §§ 1962(c), 1962(d) (Civil RICO) |
| Defendants. ) ) ) | |

## VERIFIED INITIAL CIVIL RICO COMPLAINT AND DEMAND FOR JURY TRIAL

### I.  INTRODUCTION AND NATURE OF THE ACTION

1.    This is an action for expedited civil remedies to mitigate Plaintiff's compounding damages, treble damages, and permanent injunctive relief arising from a continuous, multi-jurisdictional pattern of racketeering activity executed by an association-in-fact Enterprise comprising a dishonest former special needs trustee and debtor, his primary bankruptcy counsel, and a network of state-court defense attorneys.

2.    Plaintiff Steven Lewis Scesa is a disabled individual who suffers from a severe, incapacitating head injury. Plaintiff is the Settlor and Sole Lifetime Beneficiary of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021 (the "Trust"), a true and correct copy of which along with all trustee acceptances and resignations is attached hereto as **Exhibit C-1**.

1

Plaintiff was Editor-in-Chief of his Law Review while attending his Top-20-at-the-time law school, and practiced law at Latham & Watkins for many years before leaving the practice of law in 2004. Plaintiff is not a lawyer and has not been licensed to practice anywhere since 2004.

3.     Over a 22-month period from July 2023 to March 2025, Defendant Jeffrey Tyler Smith, while acting as Trustee of the Plaintiff's Trust, systematically breached his fiduciary duties and executed 68 distinct, unauthorized transfers totaling $478,920.33, effectively converting the entirety of the Trust res into his personal accounts and his personal LLC. This total conversion of funds reduced the disabled Plaintiff to a state of absolute economic paralysis and poverty.

4.     There is a further $45,489.29 of Trust res unaccounted for and missing from during Defendant Smith's time served as Plaintiff's Trustee.

5.     On August 12, 2025, Plaintiff filed a complaint in Florida state court against Defendant Smith for conversion, civil theft, breach of fiduciary duties and other counts (Palm Beach County, Florida Circuit Court Case No. 50-2025-CP-003930-XXXA-NB IZ) (the "Florida State Court Lawsuit").

6.     On August 18, 2025, Plaintiff effectuated service of process over Defendant Smith in the Florida State Court Lawsuit.

7.     To insulate himself from imminent civil liability and to freeze Plaintiff's recovery efforts, Defendant Smith, by and through Defendant Keith D. Slocum (operating as Slocum Law) (collectively, "Defendant Slocum"), on August 28, 2025, filed a bad-faith Chapter 13 bankruptcy petition in the Middle District of Tennessee (Case No. 3:25-bk-03605; Plaintiff's Adversary Proceeding No. 3:25-ap-90148). This petition was fraudulent from its inception, as Defendant Smith was statutorily ineligible for Chapter 13 relief under 11 U.S.C. § 109(e) due to his

2

liquidated, non-contingent debt load vastly exceeding the explicit statutory boundaries. True and correct copies of Defendant Smith's Petition Date Schedules D/E, as amended on October 30, 2025, the pertinent Proofs of Claims approved by the Tennessee Bankruptcy Court, and a summary of the foregoing are collectively attached hereto as **Exhibits C-2** through **C-5**.

8. Furthermore, Defendant Smith, with the assistance and legal counsel of Defendant Slocum, (a) venue shopped the Middle District of Tennessee based on a false assertion of Tennessee residency when Defendant Smith was in fact and subsequently admitted in the Florida State Court Lawsuit that he is a resident of Illinois; (b) intentionally disputed Plaintiff and the Florida State Court Lawsuit in his Schedule of unsecured creditors (Plaintiff's Claim No. 7 now allowed in Defendant Smith's bankruptcy and Defendant Smith's greater than 80% creditor therein) instead setting that debt at $0; (c) completely left off his Schedule of unsecured creditors a separate written loan made by the Trust to Defendant Smith's LLC personally guaranteed by Defendant Smith (Plaintiff's Claim No. 9 now allowed in Defendant Smith's bankruptcy); and (d) failed to disclose any of Plaintiff's personal property in his possession (which subsequently became and is Plaintiff's property still partially in Defendant Smith's possession and which is the very subject of the Jackson County. Illinois State Court replevin lawsuit (Case No. 2026CH1) (the "Illinois Replevin Lawsuit") in which Defendants Gene A. Turk, Jr., an individual; and Law Office of Gene Turk (collectively, "Defendant Turk") are representing Defendant Smith.

9. Recognizing that Defendant Smith possessed zero viable legal or factual defenses to the underlying trust theft in Florida or the companion replevin action in Jackson County, Illinois, Defendants formed an illicit association-in-fact Enterprise: The Concealment, Delay, and Extinguishment Enterprise (the "Enterprise").

3

10. The explicit operational purpose of this Enterprise is to bypass bankruptcy estate controls, divert estate funds to out-of-state attorneys in direct contradiction of the best interest of Defendant Smith's fiduciary duties and creditors (and certainly his greater than 80% creditor in the form of Plaintiff), and execute a multi-jurisdictional "scorched earth" war of attrition across three states against Plaintiff. The Enterprise's primary operational mechanism is procedural attrition through bad-faith tactical timing.

11. Defendants possess actual and constructive knowledge of Plaintiff's severe traumatic brain injury (TBI), daily cycles of neuro-fatigue, and acute afternoon cognitive exhaustion.

12. Rather than operating on a highly coordinated strategic blueprint and engaging in legitimate advocacy, the Enterprise relies on: a continuous default posture of systematic delay, avoidance, denial of and distraction from facts and Defendant Smith's own party admissions and testimony under oath, substance and the merits, and administrative obstruction; coupled with total refusals to meet-and-confer to resolve uncontested or patently clear issues through routine joint filings or scheduling accommodations.

13. These acts are not standard or protected litigation tactics; they constitute an intentional, passive-aggressive, bad-faith pattern of conduct and attrition strategy calculated and deployed to exploit Plaintiff's cognitive vulnerabilities, severe head injury and physical distress, and total lack of funds, resources, and legal representation in a known disabled litigant all caused directly by Defendant Smith's theft of Plaintiff's Trust res while serving as his Trustee.

14. Defendants have structured their defense on a singular, bad-faith wager: that Plaintiff will suffer a legal, cognitive or mental breakdown before ever obtaining adjudication on the merits in any court.

15.     This deliberate weaponization of Plaintiff's medical disability pierces all common-law litigation privileges and serves as an enterprise mechanism for extortion, obstruction, and intentional infliction of emotional distress.

16.     To fund this scheme, Defendant Smith:

a.     Paid Defendant Slocum a pre-petition retainer of $3,950.00 (in addition to a base $4,950.00 pre-petition retainer) solely to address issues related to Plaintiff and the Florida State Court Lawsuit in the Tennessee bankruptcy case—Defendants Smith and Slocum have never disclosed that targeted special $3,950.00 pre-petition retainer in any bankruptcy pleadings—Defendant Slocum orally disclosed it on the record at Defendant Smith's § 341 Creditor's Meeting on October 16, 2025 (a true and correct copy of the transcript of which is attached hereto as **Exhibit C-6**) to the Chapter 13 Trustee who somehow knew about it despite it never being disclosed in writing anywhere; and

b.     secretly earned $10,100.00 in post-petition income in January 2026—by operation of 11 U.S.C. § 1306(a)(2), these funds were the exclusive property of the bankruptcy estate—rather than reporting or turning over these funds to the Chapter 13 Trustee for the benefit of Defendant Smith's creditors, Defendant Slocum and Defendant Smith laundered these unapproved-at-the-time[1] estate assets through bank accounts and

---

[1] Defendant Smith swore under oath in his May 14, 2026 Declaration filed in his Bankruptcy Court case to the foregoing happening in January and February 2026, a true and correct copy of which is attached hereto as **Exhibit C-7**. The Bankruptcy Court only retroactively approved the retainer of Defendants Schulz and Turk to defend the best interests of Defendant Smith (not his creditors and certainly not his greater than 80% creditor, Plaintiff) in its Orders entered on May 22, 2026 somehow choosing to ignore the Supreme Court's clear ruling against *nunc pro tunc* orders in *Roman Catholic Archdiocese of San Juan v. Acevedo*, 589 U.S. 293 (2020). *Acevedo* explicitly strips federal courts of the power to enter *nunc pro tunc* orders unless the extraordinary burden of proving 'excusable neglect' is met. That burden is completely impossible in Defendant Smith's situation due to his affirmative and admitted under oath concealment of his January 2026 ice storm income and his secret $10,000.00 cash distributions to Defendants Schulz and Turk. In the hearing on their employment, Defendant Slocum put on zero proof to meet the *Acevedo* standard, which added a complete structural failure to both motions to employ. The Bankruptcy Court judge completely ignored *Acevedo* in addition to multiple other fatal flaws with the case and motions to employ, and

5

cashier's checks—they secretly diverted $5,000.00 to Defendants Timothy W. Schulz, an individual, and Timothy W. Schulz, P.A. (collectively, "Defendant Schulz") in Florida for the Florida State Court Lawsuit, and $5,000.00 more to Defendant Turk in Illinois for the Illinois Replevin Lawsuit, both without the mandatory prior approval of the bankruptcy court under 11 U.S.C. § 327(e).

17.     The Defendants deployed these stolen estate funds to pay Defendant Schulz and Defendant Turk to advance Florida and Illinois state-court filings and a last minute sham answer in the Florida State Court Lawsuit that directly contradicts Smith's sworn federal bankruptcy admissions in addition to his own written party admissions. This ongoing racketeering scheme relies on the structural indifference of the bankruptcy oversight apparatus to systematically strip Plaintiff of his allowed Claim No. 7 (the Florida State Court Lawsuit) and permanently extinguish his civil rights.

18.     On July 29, 2026, the court in the Florida State Court Lawsuit entered an Order granting Plaintiff's Motion for Partial Summary Judgment on Liability as to Counts I (Conversion), III (Breach of Fiduciary Duty), and V (Exploitation of a Vulnerable Adult) against Defendant Smith, a true and correct copy of which is attached hereto as **Exhibit C-8**.

## II.     JURISDICTION AND VENUE

### A.     Subject-Matter Jurisdiction

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the claims asserted herein arise under the laws of the

---

those employment orders are on appeal now in the Middle District of Tennessee District Court in Case No. 3:26-cv-00954.

United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. (Civil RICO).

20.     This Court has explicit jurisdiction over the private civil remedies provided under Civil RICO pursuant to 18 U.S.C. § 1964(c), which authorizes any person injured in his business or property by reason of a violation of section 1962 to sue therefor in any appropriate United States district court and to recover threefold the damages sustained, alongside the costs of the suit, including reasonable attorneys' fees.

21.     This Court possesses supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), because the state-law claims—specifically including Count III (Exploitation of a Vulnerable Adult under Fla. Stat. § 415.1111) and Count IV (Intentional Infliction of Emotional Distress)—are so logically and factually intertwined with the core federal civil RICO claims that they form part of the same case or controversy. These statutory and common-law tort claims arise directly out of a common nucleus of operative facts: namely, the diversion and laundering of bankruptcy estate cash to finance an extra-jurisdictional non-bankruptcy defense apparatus explicitly aimed at exploiting a disabled individual's cognitive and economic vulnerabilities.

### B.     Personal Jurisdiction

22.     Personal jurisdiction is proper over all named Defendants pursuant to 18 U.S.C. § 1965(a) and (b). Section 1965(b) authorizes nationwide service of process and the exercise of personal jurisdiction over out-of-state co-conspirators where the ends of justice require that all members of an association-in-fact Enterprise be brought before a single forum.

23.     Independent of nationwide statutory service, this Court has specific personal jurisdiction over each Defendant pursuant to Florida's Long-Arm Statute, Fla. Stat. §

48.193(1)(a), because each Defendant has engaged in an intentional, coordinated, and conspiratorial course of conduct that caused profound tortious injury and economic destruction within this judicial district:

24. Defendant Smith purposefully directed tortious conduct into Florida by systematically misrepresenting his fiduciary handling of a trust designated for a Florida resident, converting those trust assets, and purposefully engaging out-of-state and local counsel to wage a bad-faith war of exhaustion inside the Palm Beach County court system.

25. Furthermore, Defendant Smith consented to personal jurisdiction in Florida pursuant to Fla. Stat. § 736.0202 by accepting the trusteeship of a trust created by a Florida Settlor for a Florida Beneficiary, and by purposefully directing the economic effects of his conversion, civil theft and fiduciary breaches into this judicial district.

26. Defendant Slocum actively participated in and steered a multi-jurisdictional conspiracy by filing an illegitimate, statutorily ineligible Chapter 13 bankruptcy proceeding in Tennessee designed primarily to function as an extra-jurisdictional weapon against a Florida resident's pending civil recovery—namely, the Florida State Court Lawsuit. Defendant Slocum explicitly facilitated, coordinated, and reviewed unapproved, post-petition out-of-state litigation tactics inside Florida.

27. Defendant Schulz operates a law practice within this judicial district, executed an unapproved retainer agreement funded by illicitly diverted bankruptcy estate cash, entered into a deliberate, multi-state conspiratorial alliance with Defendants Smith and Slocum, and intentionally advanced a sham answer, motions and notices in the Circuit Court of Palm Beach County that directly contradict sworn admissions made by Defendant Smith in federal bankruptcy proceedings as well as in Defendant Smith's almost 91,000 text message party

admissions with Plaintiff from 2020 to 2025, and basic Florida trust law. Defendant Schulz also appears to have little or no Florida trust law experience and has repeatedly misstated the Florida Trust Code and case law based thereon thus materially compounding the conspiratorial intent and damages caused to Plaintiff.

28. Defendant Turk operates an Illinois law practice, executed an unapproved retainer agreement funded by illicitly diverted bankruptcy estate cash, and entered into a deliberate, multi-state conspiratorial alliance with Defendants Smith and Slocum, accepting unauthorized cash distributions belonging to Defendant Smith's bankruptcy estate to fund a defensive bottleneck in Illinois designed to paralyze the Florida Plaintiff's property recovery and sale thereof to fund his life efforts—property that Defendant Smith under oath in his Tennessee bankruptcy case as well as in the Illinois replevin lawsuit admitted that the property at issue is Plaintiff's yet won't turn it over to the local Illinois sheriff.

### C. Venue

29. Venue is proper in the Southern District of Florida, West Palm Beach Division, pursuant to 18 U.S.C. § 1965(a) because Defendant Schulz resides, is found, has an agent, and/or transacts his affairs within this judicial district.

30. Venue is independently proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this district. The primary economic injury—the total depletion of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021 res—is felt and suffered by Plaintiff within West Palm Beach, Florida, where Plaintiff has continuously resided since 2016.

31. Furthermore, the explicit target of the Enterprise's racketeering activity includes the ongoing subversion and bad-faith manipulation of the Florida State Court Lawsuit docket.

The Enterprise intentionally calculated its procedural strikes to compound and exploit Plaintiff's severe head injury, intending to induce cognitive exhaustion and procedural default by Plaintiff within this geographic division.

## III.   THE PARTIES AND THE ASSOCIATION-IN-FACT ENTERPRISE STRUCTURE

### A.   Plaintiff

32.    Plaintiff Steven Lewis Scesa is an individual residing within the West Palm Beach Division of the Southern District of Florida, where he has continuously resided since 2016. Plaintiff is a disabled and vulnerable individual who suffers from a severe, cognitively limiting head injury since September 25, 2016. Plaintiff is the Settlor and Sole Lifetime Beneficiary of the Trust. Plaintiff's primary economic and property interests—specifically his allowed Claim No. 7 (the Florida State Court Lawsuit) and Claim No. 9 in the underlying bankruptcy proceeding and Plaintiff's personal property still in the possession of Defendant Smith in Illinois—have been proximately destroyed, diluted, and obstructed by the targeted, coordinated racketeering activity of Defendants.

### B.   Defendants

33.    Defendant Slocum is an individual attorney licensed to practice law in the State of Tennessee. At all times relevant, Defendant Slocum operated through Slocum Law, which to Plaintiff's understanding and belief is an active trade name and sole proprietorship under his exclusive operational control. Defendant Slocum acts as the primary structural architect of the Enterprise, utilizing his specialized legal position and knowledge to file and maintain an ineligible Chapter 13 bankruptcy petition, sanitize mandatory disclosure schedules, and actively facilitate the unauthorized, unapproved post-petition pipeline of estate cash to out-of-state

defense counsel all to cause Plaintiff's total exhaustion, frustrate Plaintiff's recovery from Defendant Smith, and deprive Plaintiff of all monies on which for Plaintiff to live.

34.     Defendant Schulz is an individual attorney licensed to practice law in the State of Florida. At all times relevant, Defendant Schulz operated through Timothy W. Schulz, P.A., a Florida professional association with its principal place of business in West Palm Beach, Florida. Defendant Schulz accepted unapproved, post-petition cash distributions[2] belonging to the Tennessee bankruptcy estate to mount a bad-faith and contumacious defensive attrition campaign in the Florida State Court Lawsuit designed to bypass federal bankruptcy controls, cause Plaintiff's total exhaustion, frustrate Plaintiff's recovery from Defendant Smith, and deprive Plaintiff of all monies on which for Plaintiff to live.

35.     Defendant Turk is an individual attorney licensed to practice law in the State of Illinois and the State of Florida. At all times relevant, Defendant Turk operated through Law Office of Gene Turk, which to Plaintiff's understanding and belief is a trade name and sole proprietorship under his exclusive operational control in Carbondale, Illinois. Defendant Turk entered into the conspiracy by also accepting unauthorized, unapproved bankruptcy estate assets[3] from Defendant Smith via cashier's check to engineer a procedural bottleneck in the Illinois Replevin Lawsuit, directly advancing the Enterprise's objective of causing Plaintiff's total exhaustion, frustrating Plaintiff's recovery from Defendant Smith, and depriving Plaintiff of all monies on which for Plaintiff to live.

36.     Defendant Jeffrey Tyler Smith is an individual who, upon Defendant Smith's assertion in his answer to the complaint in the Florida State Court Lawsuit, currently resides in

---

[2] *See* footnote 1 herein with respect to the *nunc pro tunc* approval of Defendant Schulz's employment in the best interests of Defendant Smith, not his creditors, all now on appeal.
[3] *See* footnote 1 herein with respect to the *nunc pro tunc* approval of Defendant Turk's employment in the best interests of Defendant Smith, not his creditors, all now on appeal.

Jackson County, Illinois. Defendant Smith is sued both in his individual capacity and in his structural capacity as the Former Trustee of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021. Defendant Smith is the primary underlying tortfeasor, a core member of the racketeering Enterprise, and the direct source of the illicitly diverted post-petition estate funds to Defendants Schulz and Turk used to capitalize the Enterprise's multi-state obstruction strategy and cause Plaintiff's total exhaustion, frustrate Plaintiff's recovery from Defendant Smith, and deprive Plaintiff of all monies on which for Plaintiff to live.

**C.    Architecture of the "Concealment, Delay, and Extinguishment" Enterprise**

37.    Pursuant to 18 U.S.C. § 1961(4), Defendants—Slocum (individually and d/b/a Slocum Law), Schulz (individually and d/b/a Timothy W. Schulz, P.A.), Turk (individually and d/b/a Law Office of Gene Turk), and Smith—constitute an association-in-fact Enterprise. This Enterprise is an ongoing, collaborative, multi-state unit bound together by a shared unlawful objective: to insulate Defendant Smith and also themselves from absolute civil liability, systematically deplete and divert bankruptcy estate assets to evade creditor distribution, and intentionally exhaust the disabled Plaintiff through highly timed, overlapping procedural barriers and failures to respond.

38.    The Enterprise explicitly weaponizes the Chapter 13 framework as an extra-jurisdictional instrument to fraudulently delay, obstruct, and permanently deprive Plaintiff of the very funds necessary to sustain his life. Defendant Smith—by virtue of his position as Plaintiff's Trustee from 2023 to 2025, and including for years prior—had absolute, granular knowledge of Plaintiff's severe head injury, neurological symptomology, extreme cognitive vulnerability, permanent unemployability, and absolute reliance on his Trust res for basic daily survival.

12

13

39.     Plaintiff's baseline vulnerability and total lack of financial resources is documented pervasively across nearly 91,000 text message party admissions exchanged between Defendant Smith and Plaintiff from 2020 to 2025, which explicitly establish a continuous pattern of grooming, manipulation, and bad-faith redirection orchestrated by Defendant Smith at times when Plaintiff explicitly detailed his inability to comprehend or protect his own interests.

40.     The Enterprise functions as a distinct, organized hierarchy with a clear division of labor designed to exploit the multi-jurisdictional boundaries of state and federal courts:

[remainder of page left intentionally blank]

| DEFENDANT SLOCUM | DEFENDANT SMITH |
|---|---|
| Enterprise Architect + TN Counsel | Trust Res Converter |
| Manages ineligible / fraudulent from the inception Ch. 13 shield on behalf of Defendant Smith | Civil Thief |
| | Fiduciary Breacher |
| Sanitizes & omits material, mandatory information from bankruptcy Financial Schedules | Exploiter of a Vulnerable Adult |
| | Intentional Inflictor of Emotional Distress |
| Endeavors to weaponize the MDTN Bankruptcy Court against Plaintiff including, but not limited to, via vacuous, facially non-complaint, retroactive efforts to employ Defendants Schulz and Turk directly against Defendant Smith's greater than 80% creditor (Plaintiff) | Source of undisclosed special funding to Defendant Slocum specifically targeted against Plaintiff |
| | Source of unreported bankruptcy estate cash secreted to Defendant Schulz without required prior Bankruptcy Court approval directly against Defendant Smith's greater than 80% creditor (Plaintiff) despite twice self-admitted under oath commission of Counts alleged against him in the Florida State Court Lawsuit |
| | Source of unreported bankruptcy estate cash secreted to Defendant Turk without required prior Bankruptcy Court approval directly against Plaintiff despite self-admitted under oath actual owner of Plaintiff's personal property still in Defendant Smith's possession |



| DEFENDANT SCHULZ | DEFENDANT TURK |
|---|---|
| Local Conduit—Florida | Local Conduit—Illinois |
| Accepted unreported bankruptcy estate cash (with full knowledge of existence of Defendant Smith's bankruptcy and Defendant Slocum's representation therein) and no prior approval thereof by the Bankruptcy Court | Accepted unreported bankruptcy estate cash (with full knowledge of existence of Defendant Smith's bankruptcy and Defendant Slocum's representation therein) and no prior approval thereof by the Bankruptcy Court |
| Files procedurally and substantively invalid motions and notices, and a sham answer at last minute | Refuses to file an answer on behalf of Defendant Smith |
| Persistent efforts since appearance to delay, prolong and multiply proceedings | Persistent efforts since appearance to delay, prolong and multiply proceedings |

14

41.     **Operational Longevity and Continuity:** The Enterprise is not a series of isolated, *ad hoc* legal representations. It has operated continuously since at least August 2025, when Defendant Slocum and Defendant Smith launched the bad-faith Chapter 13 shield and Defendant Smith retained Defendant Schulz. It achieved heightened, coordinated cohesion in early 2026 when Defendants Schulz and Turk were formally brought into the network through unapproved retainer agreements capitalized entirely by Defendant Smith's secretly earned and diverted post-petition estate funds to each of them.

42.     **Distinction from Standard Legal Representation:** The Enterprise is structurally distinct from routine, lawful legal advocacy. A standard attorney-client relationship operates within the boundaries of statutory disclosure, procedural honesty, candor towards the tribunals, court-approved asset management, and legal counsel's absolute obligation to advise their client to concede under undisputed facts, statutes, and equities. Here, however, Defendants Slocum, Schulz, and Turk stepped completely outside the boundaries of professional immunity by actively facilitating, participating in, and executing a coordinated fraudulent scheme. Specifically, as detailed extensively in Section IV infra, Defendants crossed the line from advocacy into independent tortious and criminal conduct by:

a.     **Concealing and Laundering Bankruptcy Estate Assets:** Actively routing, concealing, and spending *nunc pro tunc* authorized post-petition bankruptcy estate funds ($10,100.00) and undisclosed pre-petition retainers ($3,950.00) to finance out-of-state litigation campaigns without the mandatory prior court approval required by 11 U.S.C. § 327(e)[4] (detailed in Section IV.A infra);

---

[4] Now, resulting in an appeal of those employment orders and denial of Plaintiff's motion. *See* Middle District of Tennessee Case No. 3:26-cv-00954.

**b.** **Filing Contradictory Sworn Documents and Sham Pleadings:** Knowingly advancing material, factual misrepresentations and a last-minute "sham" answer in the Florida State Court Lawsuit that directly deny and ignore facts Defendant Smith had already admitted under oath in federal bankruptcy filings and in his own extensive written party admissions (detailed in Sections IV.A & IV.D infra); and

**c.** **Coordinating Multi-Jurisdictional Litigation Abuse:** Orchestrating highly timed, overlapping procedural bottlenecks and deliberate non-engagement across three separate state and federal courts, with full, subjective knowledge of Plaintiff's cognitive limitations, for the explicit purpose of inducing a cognitive or physical breakdown by Plaintiff before his claims could be adjudicated on the merits (detailed in Sections IV.A & IV.D *infra*).

43. By engaging in this extra-legal conduct, Defendants Slocum, Schulz and Turk acting as officers of the court and instead became active co-conspirators, utilizing their specialized legal access as a weapon to execute actual fraud, commit larceny of bankruptcy estate assets, and inflict a targeted, willful, and malicious economic injury upon Plaintiff's property rights.

44. **The Shared Common Purpose:** The unifying mechanism driving every member of the Enterprise is the knowledge that Plaintiff's primary claim (the Florida State Court Lawsuit) represents over 80% of Defendant Smith's entire creditor body.

a. Because the claims are entirely indefensible on the merits due to Smith's twice under oath prior admissions of Trust res conversion etc. in addition to years of Defendant Smith's party admissions in the text messages between Plaintiff and Defendant Smith, Defendants have collectively agreed to bypass 11 U.S.C. § 327(e).

b.      Defendants operate a violently expensive non-bankruptcy defense network against Plaintiff soon to be in excess of Defendant Smith's entire Chapter 13 confirmed plan over its entire five-year duration[5] funded by cash that is better given to creditors, relying entirely on the systematic imposition of cognitive fatigue and financial exhaustion by Plaintiff to force the disabled Plaintiff into a procedural default and total destitution with no necessary medical care or housing whatsoever.

c.      What makes this endeavor even more insidious and malicious is that Plaintiff's Florida State Court Lawsuit claims are entirely non-dischargeable in Defendant Smith's Chapter 13 case under Bankruptcy Code §§ 523(a)(4) & (6).

d.      At worst, all that happens is Plaintiff waits until the conclusion of the confirmed bankruptcy plan in December 2030 and executes judgement on all of Defendant Smith's assets and income for the rest of his life after five years of further compounding of Plaintiff's damages due to the delay and statutory interest thereon—just the statutory interest by mathematical calculation adds over fifty percent (50%) to Defendant Smith's liability to Plaintiff by employing this impossible scheme.

e.      The defense in the Illinois Replevin Lawsuit makes even less sense since Defendant Smith has multiple times stated under oath that the property in question is Plaintiff's and in possession of Defendant Smith despite the local Sheriff's attempts to merely recover and take possession of it since January 2026—Defendant Smith and Defendant Turk have even asserted in writing that Plaintiff's property should be awarded

---

[5] Defendant Smith's confirmed Chapter 13 plan is for a mere $2,200/month for five years--$132,000 total. Defendant Smith's defense costs with Defendant Schulz in the Florida State Court Lawsuit will easily surpass that amount by early 2027 under their "scorched earth" / "delay, refuse and deny everything" strategy. Merely to complete expert witness testimony will cost Defendant Smith well over $250,000 and through trial could easily run into the $500,000 to $1 million dollar range. Yet, Defendant Smith is somehow in a Chapter 13 confirmed plan totaling only $132,000 over its five-year term.

17

to Defendant Smith for no rational or explained reason whatsoever—just "award it to Defendant Smith."

45.     For absolute clarity, Defendants Slocum, Schulz and Turk did not commit or participate in the initial physical conversion, civil theft and breach of fiduciary duty of the $478,920.33 Trust res executed exclusively by Defendant Smith between July 2023 and March 2025. Rather, Defendants Slocum, Schulz and Turk knowingly, willfully, and maliciously entered into a subsequent fraudulent scheme and Enterprise to ring-fence and shield those stolen assets and Defendant Smith's liability to Plaintiff resulting therefrom once exposed. The post-petition operational maneuvers of all named Defendants constitute independent acts of actual fraud, larceny of post-petition bankruptcy estate property, and a targeted civil conspiracy executed with the specific intent to inflict an ongoing, willful, and malicious economic injury upon Plaintiff's property rights.

46.     **Defendant Smith's Pre-Trust Involvement, Long-Standing Scienter, and Imputed Enterprise Knowledge:**

a.      Defendant Smith's confidential relationship, position of trust, and granular knowledge of Plaintiff's neurological deficits long predated his agreeing to serve as Plaintiff's Trustee on February 9, 2023.

b.      As early as 2020, Defendant Smith was an active member of Plaintiff's personal care "Core Group" and directly participated in evaluating, memorializing, and managing Plaintiff's TBI symptomology.

c.      Specifically, prior to and culminating on September 9, 2020, Defendant Smith assisted in drafting and reviewing the formal "Symptoms Summary" document,

18

which explicitly outlined Plaintiff's TBI baselines, cognitive exhaustion thresholds, and deference vulnerabilities that Plaintiff still uses to this day.

d.      Defendant Smith subsequently assisted in structuring the Steven Lewis Scesa Special Needs Trust dated February 11, 2021—an entity established by operation of law specifically to protect a vulnerable adult.

e.      By virtue of this deep historical involvement, the 91,000 contemporaneous text messages exchanged between 2020 and 2025, and direct service of the underlying Florida State Court filings, Defendant Smith possessed actual, subjective knowledge of Plaintiff's protected status years before converting $478,920.33 in Plaintiff's Trust principal.

f.      Furthermore, co-conspirator Defendants Slocum, Schulz, and Turk were placed on actual notice of the September 9, 2020 Symptoms Summary, the 91,000 text message admissions. Despite this actual notice, these attorney co-Defendants knowingly agreed to join, execute, and direct the Enterprise's bad-faith procedural attrition strategy, thereby foreclosing any defense of "willful blindness" or objective good faith under 18 U.S.C. § 1962(c) and (d).

**D.      The Extralegal, Fraudulent, and "Sham" Nature of Defendants' Litigation Conduct / Inapplicability of the Litigation Privilege and Noerr-Pennington Doctrine.**

**1.      The "Sham Litigation" Exception Bypassing the Noerr-Pennington Doctrine.**

47.      Plaintiff's claims are not barred by the Noerr-Pennington doctrine, which protects genuine, petitioning activity before judicial bodies. The defenses, motions, and pleadings interposed by Defendants in the underlying state and federal proceedings do not constitute a genuine, good-faith attempt to seek judicial redress. Instead, they are a coordinated, bad-faith

"sham" designed solely to delay, obstruct, cognitively and financially exhaust, and procedurally default Plaintiff while exploiting his severe head injury.

48.     Under the controlling standard articulated in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) (PRE), Defendants' litigation conduct falls squarely within the "sham litigation" exception because it meets both the objective and subjective prongs of the test:

a.     **The Defenses are Objectively Baseless:** No reasonable litigant could realistically expect success on the merits of the defenses asserted. The underlying trust conversion / theft / other claims pled, the mathematical ineligibility of Defendant Smith's Chapter 13 bankruptcy under 11 U.S.C. § 109(e), the employment of Defendants Schulz and Turk being anything other than NOT being in the best interests of Defendant Smith's bankruptcy estate and creditors, and the unlawful diversion of estate assets are legally and factually indisputable. Defendants have asserted no colorable, good-faith legal defense to these core violations; instead, they rely on frivolous procedural delay, factual misrepresentations, and willful non-engagement.

b.     **The Defenses are Subjectively Intended to Abuse the Judicial Process:** Defendants' litigation strategy is not directed at achieving a favorable, lawful resolution on the merits. Rather, the subjective, bad-faith purpose of their coordinated litigation posture is to use the judicial system as a weapon of economic and cognitive exhaustion, concealment, and intimidation. The objective is to drive the financial and mental costs of these proceedings so high that Plaintiff is forced to capitulate, effectively insulating Defendant Smith's conversion and theft of Plaintiff's Trust res, his indisputable liabilities, and his Defendant conspirators' bad-faith obstruction campaign from recovery.

20

### 2.    Extralegal Financial Laundering Is Not Protected "Litigation Activity"

49.    Defendants Slocum, Schulz, and Turk cannot cloak independent torts and fraud in the guise of "zealous advocacy." While the litigation privilege immunizes communicative advocacy in open court, it does not shield physical or financial conduct. Operating as an active financial conduit—diverting and laundering unauthorized bankruptcy estate assets to fund a weaponized campaign of cognitive attrition—is an independent tortious and criminal act, entirely stripped of immunity.

50.    Under controlling Florida, Illinois, and Tennessee law, the litigation privilege and attorney immunity shield apply strictly to lawful, communicative acts within judicial proceedings; they never immunize independent torts, post-petition bankruptcy fraud, or the active laundering and siphoning of estate assets under the guise of legal representation. Where attorney defendants step outside legitimate advocacy to knowingly operate an extralegal financial conduit and execute a bad-faith campaign of cognitive attrition against a vulnerable litigant, their conduct breaks all common-law and Rule 12(b)(6) immunity shields as a matter of law.

51.    Specifically, Defendants Schulz and Turk accepted, concealed, and spent post-petition bankruptcy estate assets to fund their defense fees without obtaining the mandatory **prior** authorization of the Bankruptcy Court under 11 U.S.C. § 327(e) and 11 U.S.C. § 330 and this was orchestrated, structured and achieved (for the moment)[6] by Defendant Slocum on behalf of Defendant Smith—not Defendant Smith's bankruptcy estate or creditors.

---

[6] As mentioned above, these employment orders are under appeal in Middle District of Tennessee Case No. 3:26-cv-00954.

52. This conduct does not constitute "advocacy"; it is the direct execution of a money laundering and asset-diversion scheme.

53. Under the laws of Florida, Illinois, and Tennessee, the common-law litigation privilege is strictly limited to acts occurring during the course of a judicial proceeding that have a relation to the cause. It does not—and cannot—immunize out-of-court financial transactions, independent criminal acts of money laundering, bank fraud, wire fraud, bankruptcy fraud, or a coordinated, multi-jurisdictional litigation playbook of sham filings and deliberate non-engagement designed to exploit a vulnerable adult's severe cognitive impairment and stall adjudication on the merits.

54. Because Defendants' litigation efforts are structurally designed to advance meritless, contradictory positions and are actively funded by the unauthorized, fraudulent diversion of estate assets to systematically exploit a vulnerable adult, head injured Plaintiff, the litigation itself serves as a bad-faith instrument of the conspiracy and is stripped of any common-law immunity.

**3. State Law Privileges Cannot Trump Federal Supremacy**

55. To the extent Defendants attempt to assert the common-law litigation privileges of Florida, Illinois, or Tennessee as a blanket shield against liability, such a defense is legally untenable as a matter of constitutional law.

56. Under the Supremacy Clause of the United States Constitution (U.S. Const. art. VI, cl. 2), a state-created common-law privilege or immunity cannot override, dilute, or immunize conduct that violates a federal statutory scheme.

57. The federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, is a comprehensive federal criminal and civil enforcement statute

designed to eradicate systemic patterns of racketeering activity, including mail fraud, wire fraud, bankruptcy fraud, and money laundering.

58. Allowing a state common-law litigation privilege to bar federal civil RICO claims would completely frustrate the intent of Congress and render federal anti-racketeering statutes teethless against dishonest litigants and attorneys who use the courts to facilitate criminal enterprises.

59. Accordingly, because Plaintiff's primary claims arise under federal statutory law, the respective state-law litigation privileges of Florida, Illinois, and Tennessee are wholly inapplicable and cannot immunize Defendants from civil RICO liability under 18 U.S.C. § 1964(c).

## IV. THE PATTERN OF RACKETEERING ACTIVITY

### A. The Predicate Acts Anchored in Statutory Violations

60. Pursuant to 18 U.S.C. § 1961(1) and (5), Defendants executed a continuous pattern of racketeering activity through the commission of multiple, related predicate acts of bankruptcy fraud (18 U.S.C. § 152), mail fraud (18 U.S.C. § 1341), and wire fraud (18 U.S.C. § 1343).

61. These acts were not isolated events, but rather a highly synchronized, multi-jurisdictional strategy to submit fraudulent filings, deceive the Bankruptcy Court, intentionally delay and stall Defendant Smith's inevitable liability and responsibility to Plaintiff in bad faith and contempt, launder undisclosed bankruptcy estate funds across state lines in furtherance of the foregoing, and conceal Plaintiff's assets and bankruptcy estate assets to maintain an unapproved, rogue defense apparatus and weaponize multi-state legal proceedings against Plaintiff in bad faith and contempt with full knowledge of Plaintiff's cognitive vulnerabilities, head injury and

total lack of funds, resources, medical care, and legal representation as a result of Defendant Smith's theft of Plaintiff's entire Trust res.

62. **The Bankruptcy Fraud Schema (18 U.S.C. § 152):** The Enterprise repeatedly deployed false oaths, material omissions, and outright failure to comply with the Bankruptcy Code within the Middle District of Tennessee bankruptcy proceeding to construct a fraudulent shield over Defendant Smith's assets. This component of the pattern includes:

a. **Concealment of Pre-Petition Liabilities:** In order to obscure the true volume of **non-contingent, liquidated debt** that rendered Smith statutorily ineligible for Chapter 13 relief under 11 U.S.C. § 109(e)'s maximum unsecured debt limit of $526,700, Defendants Smith and Slocum intentionally omitted from or set at $0 in Defendant Smith's initial bankruptcy schedules the following as of Defendant Smith's Petition date filed August 28, 2025:

i. The liquidated and non-contingent amount of Trust res converted and stolen by Defendant Smith of $478,920.33 plus statutory interest thereon under Fla. Stat. § 55.03 in the amount of $57,840.12, totaling $536,760.45—this one part of that claim alone exceeds the unsecured claim maximum ceiling for Chapter 13 eligibility, yet Defendants Smith and Slocum scheduled it at $0 somehow—in no uncertain terms, Defendant Smith had 100% of the information necessary to determine and calculate the liquidated and non-contingent amount of Trust res converted and stolen by him at all times since he first converted and stole part of Plaintiff's Trust res on July 12, 2023, and Defendant

24

Slocum necessarily had that same information available to him from Defendant Smith;

ii.  the written loan agreement and personal guarantee underpinning Plaintiff's Proof of Claim No. 9 totaling a further $31,368.36;

iii.  a written payment plan and personal guarantee to The SilverLogic, LLC (TSL) totaling a further $219,792.05 as set forth in Proof of Claim No. 10;

iv.  a loan from the U.S. Small Business Administration totaling a further $46,065.43 as set forth in Proof of Claim No. 8;

v.  a loan owned by Dext Capital totaling a further $25,611.70 as set forth in Proof of Claim No. 1;

vi.  a loan owned by Marlin Leasing Corp (PEAC) totaling a further $119,237.80 as set forth in Proof of Claim No. 3;

vii.  a loan from Jefferson Capital Systems totaling a further $8,599.84 as set forth in Proof of Claim No. 6;

viii.  a loan from Medallion Bank totaling a further $8,654.78 as set forth in Proof of Claim No. 11; and

ix.  two loans from ODK Capital LLC in the amounts of $51,252.74 and $20,320.80 totaling a further $71,573.54 as set forth in Proofs of Claim Nos. 14 and 15.

x.  **A grand total of unsecured debt ignored, omitted or zeroed out in the amount of $1,067,663.95—more than double the statutory maximum for eligibility for Chapter 13 relief.**

25

xi. Even if Defendants Smith and Slocum somehow managed to "forget" or be unable to calculate these incredible amounts from known creditors as of the Petition Date, they amended Defendant Smith's schedules on October 30, 2025 at which time all of the foregoing Proofs of Claim were filed other than the two from ODK Capital LLC which were filed on November 5, 2025 the day the claims period closed.

xii. No later than October 30, 2025, Defendants Smith and Slocum had absolute knowledge of the total ineligibility of Defendant Smith's bankruptcy petition under Chapter 13 and the mandatory nature of its dismissal with prejudice, yet they remained silent and continue to remain silent on that ineligibility to this day.

b.     **Concealment of Retainer Agreements:** The systematic failure still to this day to disclose in writing the targeted $3,950.00 pre-petition retainer specifically earmarked for Defendant Slocum to fight Plaintiff (Defendant Smith's greater than 80% creditor), directly violating mandatory disclosure requirements—this payment to Defendant Slocum is reflected nowhere in Defendant Smith's bankruptcy schedules.

c.     **Concealment of Post-Petition Assets:** The intentional failure to report or turn over the $10,100.00 in post-petition cash income earned in January 2026, which constituted exclusive property of the bankruptcy estate under 11 U.S.C. § 1306(a)(2).

d.     **The Deceptive and Statutorily Bankrupt Applications to Employ Out-of-State Non-Bankruptcy Defense Counsel (Defendants Schulz and Turk) Not in the Best Interests of Creditors and Solely to the Benefit of Defendants Smith, Schulz**

26

**and Turk.** The Enterprise's attempts to secure retroactive (*nunc pro tunc*) bankruptcy court approval for out-of-state litigation defense counsel for Defendant Smith by Defendants Schulz and Turk through bad-faith applications to employ coordinated and sought by Defendant Slocum (true and correct copies of which along with their respective supporting affidavits from Defendants Schulz and Turk are attached hereto as **Exhibits C-9** and **C-10**) represent a distinct, coordinated abuse of the bankruptcy process. Rather than serving any legitimate estate purpose, these retroactive applications patently fail on their face, suffering from at least seven (7) distinct statutory, mathematical, and procedural defects:

> i.        **Failure to Benefit the Estate (11 U.S.C. § 327(e)):** The employment motions failed to meet the threshold statutory burden of proving that the retentions are in the best interest of the estate or its creditors. By Defendant Smith's own sworn declaration dated May 14, 2026, these attorneys were retained strictly to protect Defendant Smith's "personal legal interests" and "personal legal expenses" in defending:

> > A.        The non-dischargeable civil theft and trust conversion action against Defendant Smith brought by Plaintiff in the Florida State Court Lawsuit—a defense that offers absolutely zero financial or legal benefit to the estate's creditors and 100% by definition NOT in the best interests of Plaintiff who is Defendant Smith's greater than 80% creditor; and

> > B.        The simple replevin action against Defendant Smith by Plaintiff in the Illinois Replevin Lawsuit—a defense solely related to

Plaintiff endeavoring to secure under $30,000[7] of personal property admitted by Defendant Smith to be Plaintiff's property yet he refuses to turn it over to the local sheriff from whom Plaintiff would immediately recover it.

    ii.    **Violations of Retroactive Approval Standards (*Acevedo*):** The applications sought retroactive (*nunc pro tunc*) employment in direct violation of the Supreme Court's holding in *Roman Catholic Archdiocese of San Juan v. Acevedo*, 589 U.S. 293 (2020). Because retroactive approval requires a showing of "excusable neglect," Defendant Smith's deliberate concealment of $10,100.00 in post-petition ice storm income and the subsequent under-the-table distribution of $10,000.00 to Defendants Schulz and Turk completely forecloses any legal basis for retroactive relief.

    iii.    **Funding and Budgetary Impossibility:** The applications identified no viable budget or source of ongoing funding, directly contradicting the Chapter 13 Trustee's guidelines. While Defendant Slocum flippantly suggested that these out-of-state defense fees could simply be processed as "administrative claims" under a modified plan, this is a commercial fantasy.

---

[7] Now reduced to $17,465.17 of personal property as a result of prior turn over orders obtained by Plaintiff in that Illinois Replevin Lawsuit. A trial with respect to that remaining personal property is now set for August 19, 2026. All Defendant Smith needs to do is simply turn over Plaintiff's property to the local sheriff and be done with it yet Defendants Smith and Turk refuse to do any such thing and solely intend to fight Plaintiff to the bitter end at all costs.

    Plaintiff notes that on December 17, 2025, Plaintiff secured an order from the Tennessee Bankruptcy Court with respect to the personal property at issue here declaring it outside the jurisdiction of that court because it was not Defendant Smith's property—it is Plaintiff's property as admitted to by Defendant Smith multiple times.

    Plaintiff also secured an emergency replevin and sequestration order in the Illinois Replevin Lawsuit on January 21, 2026 with respect to this property that Defendant Smith refused to allow the local sheriff to execute upon being served in person with the order at Defendant Smith's home in Makanda, Illinois.

    Trial is set for August 19, 2026.

28

Navigating discovery alone in Defendant Smith's defense by Defendant Schulz of the non-dischargeable Florida State Court Lawsuit alone will realistically cost between $100,000.00 and $250,000.00[8] merely in the next 6-12 months—for Defendants Smith and Schulz to defend through expert witnesses, pre-trial preparations and trial will easily run a further $250,000 to $500,000 in 2027—staggering liabilities that are mathematically impossible for Defendant Smith to fund, and which would commit massive mathematical violence against actual estate creditors in a confirmed plan totaling a mere $132,000 over five years.

  iv.  **No Legitimate Defensive Objective:** The employment motions seek to fund entirely meritless and procedurally bankrupt defenses.

    A.  In Illinois, the replevin action concerns personal property that the bankruptcy court already ruled in December 2025 is not property of the estate, meaning the $5,000.00 diverted to Defendant Turk so far has been used solely to keep Defendant Smith defending the indefensible and preventing the local sheriff from recovering Plaintiff's personal property in the possession of Defendant Smith.

    B.  In the Florida State Court Lawsuit, Defendant Smith has already confessed under oath twice to the underlying trust conversion, breach of fiduciary duty and exploitation of a vulnerable adult, leaving Defendant Schulz with no viable defense to mount.

---

[8] And, please keep in mind that these are in after-tax dollar amounts, so the income that Defendant Smith must earn to be able to fund these amounts to Defendants Schulz and Turk (and Defendant Slocum to have them approved in the Tennessee Bankruptcy Court) is necessarily considerably greater.

v.　　**Concealment of Severe, Non-Waivable Conflicts (Rule 2014):**
The applications failed to disclose critical, disqualifying conflicts of interest under Federal Rule of Bankruptcy Procedure 2014. Specifically, Defendant Schulz's private engagement contract contains an undisclosed, mandatory arbitration clause that strips the bankruptcy court of fee jurisdiction, an unapproved lien on potential estate assets, and collection threats. Furthermore, each of Defendants Slocum, Schulz and Turk are aware that they face personal sanctions and disqualification motions in their respective jurisdictions as well as all four Defendants having been served with litigation hold letters by Plaintiff in connection with this action on June 10, 2026, true and correct copies of which are collectively attached hereto as **Exhibit C-11**. An incurable, concurrent conflict between their personal self-preservation and their duties to the estate has existed for months now.

vi.　　**Threshold Statutory Ineligibility (11 U.S.C. § 109(e)):** The employment motions are a structural nullity because Defendant Smith is mathematically disqualified from Chapter 13 relief since the inception of that case on August 28, 2025. Because Defendant Smith's general, liquidated, non-contingent unsecured liabilities of $548,818.54 (excluding Plaintiff's Proof of Claim No. 7 that is the Florida State Court Lawsuit) exceeded the strict statutory ceiling of $526,700.00 as of the Petition Date—and are more than double the statutory ceiling permitted for Chapter 13 eligibility merely from adding in the liquidated and non-contingent portion of the Florida State Court Lawsuit—that bankruptcy court lacks the foundational authority to confirm a plan or approve the

30

retention of any professionals in that legally impossible proceeding. Plaintiff has repeatedly brought this deception to the direct attention of Defendant Slocum, the Chapter 13 Trustee, the US Trustee and the Bankruptcy Court judge (at least barely before he cut off Plaintiff yet again) and none of them want to acknowledge the outright fraud on Title 11 they all have allowed to exist and persist for almost a year now.

e.      **Systemic Disclosure Fraud and Estate Asset Laundering (11 U.S.C. § 1306) / Breach of Fiduciary Duty to the Bankruptcy Court, Chapter 13 Trustee, and Most of All Creditors.**

i.      **Chapter 13 Debtors and Counsel as Fiduciaries to Creditors:** Under 11 U.S.C. § 1306 and the persuasive, widely adopted reasoning of *In re Waldron*, 536 F.3d 1239 (11th Cir. 2008)—the core holdings of which are consistently applied by the Sixth Circuit and courts thereunder[9]—a Chapter 13 debtor (Defendant Smith by and through his counsel Defendant Slocum) does not

---

[9]*See Stanley v. FCA US LLC (In re Stanley)*, 197 F.3d 66 (6th Cir. 2022) (emphasizing that the ongoing duty to disclose changes in financial condition and assets is at the very core of the bankruptcy process and that "[a] doctrine that induces debtors to be truthful in their bankruptcy filings will assist creditors in the long run"); *In re Saults*, 293 B.R. 739 (Bankr. E.D. Tenn. 2002) ("The Sixth Circuit Court of Appeals has often reiterated that a debtor's good faith is an inherently factual determination adjudged from a totality of the circumstances. *See, e.g., Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 131 (6th Cir. 1995) ("Good faith is an amorphous notion, largely defined by factual inquiry.")"); *In re Moore*, 602 B.R. 40 (Bankr. E.D. Tenn. 2019) (discussing post-petition windfalls becoming estate property and citing *Waldron* for the proposition that disclosure is an ongoing affirmative duty); *Industrial Insurance Services, Inc. v. Zick (In re Zick)*, 931 F.2d 1124 (6th Cir. 1991) (citing *In Re Jones*, 114 B.R. at 917, 926 (citing *Local Loan v. Hunt*, 292 U.S. 234, 54 S.Ct. 695 (1934), among many other cases) that "[A]lthough the jurisdictional requirement of good faith is not explicitly stated in the statute, it is inherent in the purposes of bankruptcy relief" and "The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. Bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors. Good faith and candor are necessary prerequisites to obtaining a fresh start. The bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start."); and *Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir. 1990) ("Caldwell is not the type of debtor whom the bankruptcy laws were meant to protect. *See also Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983) (court should determine whether debtor is attempting "to abuse the spirit of the Bankruptcy Code")").

31

operate in a vacuum of self-interest. Rather, Defendant Smith stands in a fiduciary-like capacity to the bankruptcy estate and its creditors (and especially his greater than 80% creditor, Plaintiff), particularly unsecured creditors. Because Defendant Smith retains possession of estate property under § 1306(b), this possession is conditioned upon an absolute, self-executing, and continuous duty of utmost candor. This fiduciary obligation demands that Defendant Smith by and through his counsel Defendant Slocum promptly, fully, and honestly disclose all post-petition assets, income fluctuations, and financial transactions to ensure the integrity of the disposable income pool available for creditor distribution under 11 U.S.C. § 1329, and most of all eligibility for Chapter 13 protection including when unsecured debts exceed the statutory ceiling set forth in 11 U.S.C. § 109(e).

ii. **A Chronic, Continuous Pattern of Omission Since the Petition Date:** Defendant Smith's January 2026 secret earnings and asset diversion to Defendants Schulz and Turk papered over by Defendant Slocum is not an isolated lapse in judgment; rather, it represents the continuation of a bad-faith pattern of concealment initiated by Defendants Smith and Slocum at the very inception of this case. As detailed in the preceding subparts of Paragraph 62, the Enterprise has consistently treated the bankruptcy filing not as a mechanism for honest reorganization, but as a shield to hide assets, mislead creditors, and endeavor to extinguish Plaintiff's Florida State Court Lawsuit. This pattern of systemic nondisclosure includes:

iii.       The initial filing of materially false schedules that:

A.      Omitted the $3.950.00 retainer paid by Defendant Smith to Defendant Slocum solely to deal with Plaintiff and the Florida State Court Lawsuit;

B.      Intentionally omitted or zeroed out over $1,000,000 of readily determinable unsecured debt to fraudulently appear to be below the statutory ceiling set forth in 11 U.S.C. § 109(e);

C.      Omitted all of Plaintiff's personal property in the possession of Defendant Smith that is the subject of the Illinois Replevin Lawsuit;

D.      A persistent, bad-faith failure to disclose significant income increases earned by Defendant Smith when earned, and the potential for gifts to Defendant Smith from unspecified sources to the tune of hundreds of thousands of dollars to fund his litigation defense costs with Defendants Schulz and Turk against Plaintiff[10] from the petition date onward; and

E.      The active, continuous withholding of material financial data from the Chapter 13 Trustee and creditors, ensuring that the true value of Defendant Smith's estate remains obscured.

iv.      **The January 2026 Diversion as an Active Breach of Fiduciary Duty:** In direct violation of their ongoing fiduciary obligations to Defendant Smith's estate's unsecured creditors, Defendant Smith—actively counseled, aided, and abetted by Defendant Slocum—affirmatively concealed $10,100.00 in post-

---

[10] As sworn to by Defendant Smith in his May 14, 2026 Declaration filed in his bankruptcy case by Defendant Slocum.

petition corporate earnings generated in January 2026. Instead of submitting these funds to the Chapter 13 Trustee to satisfy outstanding creditor claims, the Enterprise treated these estate assets as a private litigation war chest. They laundered and diverted these funds out of the estate—routing $5,000.00 to Defendant Schulz in Florida and $5,000.00 to Defendant Turk in Illinois—to finance and wage unauthorized, unapproved (at the time of those routings) state-court defensive campaigns against Plaintiff. This diversion of cash directly starved the estate of assets that belonged to Defendant Smith's creditors—not Defendants Schulz and Turk—representing a egregious, bad-faith breach of Defendant Smith's fiduciary trust and Defendants Slocum's, Schulz's and Turk's ethical obligations under their respective State Bars.

v. **The Absence of Voluntary Disclosure and the Forced Cover-Up:** Aligning with their historical pattern of deceit, at no point did Defendants voluntarily act in accordance with their fiduciary or ethical duties. The Enterprise actively shielded this illicit siphoning from judicial, trustee and creditor oversight, and it was only admitted under oath on May 14, 2026, via a sworn Declaration filed by Defendant Smith (Bankruptcy Court Docket No. 149)—and only after Plaintiff proactively filed an update exposing the unapproved post-petition expenditures on April 19, 2026 (Bankruptcy Court Docket No. 134). Forced into a corner by this exposure, Defendants immediately attempted a panicked, retroactive cover-up, filing *nunc pro tunc* employment motions the very next day on April 20, 2026 (Bankruptcy Court Docket Nos. 135 & 136) in an aborted, bad-faith effort to sanitize their unauthorized transfer of estate property.

34

vi.     **Proximate Harm to Plaintiff and Unsecured Creditors:** This coordinated pattern of concealment, from the initial petition omissions to the post-petition laundering of corporate earnings, demonstrates a systematic scheme to bypass federal bankruptcy controls and strip the estate of distributable wealth. By utilizing estate cash to finance extra-jurisdictional, non-bankruptcy defense counsel, the Enterprise has directly harmed Plaintiff incredibly and all unsecured creditors. This continuous breach of fiduciary duty has depleted the estate's resources, artificially reduced the funds available for plan distribution, maintained a Chapter 13 case more than twice in excess of the statutory maximum ceiling of unsecured debts, and forced the disabled Plaintiff to engage in a costly, exhausting war of attrition to compel the basic transparency that the law requires Defendants to provide voluntarily from day one.

f.     **The July 29, 2026 Court Order in the Florida State Court Lawsuit Establishing Liability to Plaintiff Against Defendant Smith:** On July 29, 2026, the court in the Florida State Court Lawsuit entered an Order granting Plaintiff's Motion for Partial Summary Judgment on Liability as to Counts I (Conversion), III (Breach of Fiduciary Duty), and V (Exploitation of a Vulnerable Adult) against Defendant Smith. Exhibit C-8. This binding judicial adjudication holding Defendant Smith liable as a matter of law conclusively guts any colorable defense that Defendants Smith, Slocum and Schulz have or had with respect to the Enterprise, including, but not limited to, the Florida State Court Lawsuit itself and siphoning bankruptcy estate assets by Defendants Smith and Slocum to Defendant Schulz, in all cases, constituted legitimate, good-faith legal defenses or expenses.

63.     **The Tactical Role of Defendant Schulz in the Florida State Court Lawsuit Enterprise Attrition Scheme.** Similar to the bad-faith, coordinated maneuvers executed by Defendant Slocum in the Bankruptcy Court schema, Defendant Schulz's involvement in the Florida State Court Lawsuit represents a calculated, passive-aggressive campaign of deliberate delay, tactical non-engagement, and systemic obstruction in furtherance of the Enterprise. This posture was designed not to assert a colorable, good-faith defense, but to bypass federal bankruptcy oversight, insulate Plaintiff's Trust res converted and stolen by Defendant Smith, and financially and cognitively exhaust the disabled Plaintiff. Specifically, Defendants Schulz and Smith systematically advanced the Enterprise's objectives through the following chronological and operational steps:

a.      **Stealth Retention and Strategic Tactical Silence:** Defendant Schulz was retained by Defendant Smith on August 20, 2025—exactly three days after Defendant Smith was personally served with the summons and complaint in the Florida State Court Lawsuit on August 17, 2025. Yet, despite being actively retained to defend that action, Defendant Schulz remained completely silent on the sidelines for over six months. He filed no pleadings, entered no appearance, and intentionally kept the state court and Plaintiff in a state of informational blackout, even after the Tennessee Bankruptcy Court entered its order lifting the automatic stay on December 17, 2025.

b.      **Defying Federal Court Deadlines and Forcing Compelled State Action:** The Bankruptcy Court's December 17, 2025 order lifting the automatic stay explicitly granted Defendant Smith forty-five (45) days to file his responsive pleading in the Florida State Court Lawsuit. Defendants Schulz and Smith willfully ignored this federal deadline, allowing it to expire without action. To break this deliberate bottleneck,

Plaintiff was forced to expend his highly limited cognitive resources to secure a further compelling order from the Florida State Court Lawsuit, which finally forced Defendant Smith to file an answer on or before June 3, 2026.

    c.    **The Eleventh-Hour "Sham" Answer:** On June 2, 2026—exactly one day prior to the court-mandated deadline and nearly ten months after his initial retention— Defendant Schulz filed a patently frivolous "sham" answer on behalf of Defendant Smith, a true and correct copy of which is attached hereto as **Exhibit C-12**. This pleading flatly denied the very conversions, thefts, and egregious fiduciary breaches that Defendant Smith had already admitted under oath in his federal bankruptcy schedules and across years of explicit, written party admissions. The "sham" answer was clearly the answer of Defendant Schulz and not Defendant Smith for at least six reasons:

    i.    **Total Lack of Personal Verification:** The pleading was signed exclusively by Defendant Schulz and completely lacked any personal verification, oath, or signature from Defendant Smith to substantiate its factual representations.

    ii.    **Feigned Ignorance of Defendant Smith's Own Actions:** The sham Answer claimed a "lack of knowledge" multiple times regarding foundational facts uniquely within Defendant Smith's personal experience, such as direct written warnings from financial advisors, specific text messages sent to his phone, and the very reasons for the creation of Plaintiff's Trust and Defendant Smith's service as Plaintiff's trustee.

    iii.    **Direct Contradiction of Sworn Federal Admissions:** Defendant Schulz deployed blind denials covering the exact bank transfers, fund diversions,

and household expenditures that Defendant Smith had already openly admitted to under oath in his federal bankruptcy testimony and certified discovery responses.

iv.      **Fabrication of Groundless Defenses:** The sham Answer raised an affirmative defense alleging a mutual "agreement" to use almost 100% of Plaintiff's trust funds to grow a business—Defendant Smith's lawn mowing business—a claim fabricated out of whole cloth that directly contradicts Defendant Smith's own sworn testimony that "no documentation" exists to support such an arrangement.

v.       **Recycling of Already-Rejected Arguments:** Defendant Schulz reasserted an identical boilerplate standing defense using the exact same case citations that that Court had already heard, considered, and flatly denied just fourteen days prior.

vi.      **Defendant Schulz's Documented Continued Willful Blindness:** Defendant Schulz's own written correspondence explicitly confirmed his absolute ignorance of the record, demonstrating that he chose to draft a blind pleading rather than review the thousands of pages of devastating, publicly available evidence generated by his own client, Defendant Smith, the Tennessee Bankruptcy Court portions of which was generated under the representation and at all times was in the control of Defendant Slocum.

vii.     **The July 29, 2026 Court Order in the Florida State Court Lawsuit Establishing Liability to Plaintiff Against Defendant Smith:** The entry of the July 29, 2026 order in the Florida State Court Lawsuit dispositively adjudicating Defendant Smith's conversion, breach of fiduciary duty and

38

exploitation of a vulnerable adult, Exhibit C-8, further confirms that Defendant Schulz's eleventh-hour, unverified Answer was an objectively baseless sham pleading, calculated solely to manufacture procedural delay and facilitate the ongoing diversion of estate funds under the false pretense of an active, colorable legal dispute.

d.     **Absolute Lack of Subject-Matter Competence:** Defendant Schulz operates a general commercial litigation practice. A review of his firm's website and public biographies reveals that he possesses zero specialized experience, credentials, or practice focus in trust litigation, probate administration, or the complex fiduciary standards governing special needs trusts.

e.     **Conscious Avoidance of Glaring Fiduciary Conflicts:** On March 3, 2026—the day immediately following Defendant Schulz's late Notice of Appearance on March 2, 2026—Plaintiff sent a direct, detailed inquiry via email to Defendant Schulz questioning his trust litigation experience, awareness of Defendant Smith's bankruptcy case, and the background facts in the Florida State Court Lawsuit. Plaintiff subsequently thereto in other written communications highlighted the severe ethical and legal boundaries violated by representing a trustee who had already confessed to converting the entirety of a disabled beneficiary's trust res. Defendant Schulz chose the "Ostrich" posture, willfully ignoring all such communications and failed to respond.

f.     **Facially Bankrupt Arguments Defying the Florida Trust Code:** Rather than addressing the merits, the limited filings Defendant Schulz has actually made in the Florida State Court Lawsuit advance legal arguments that totally fly in the face of the Florida Trust Code (Chapter 736, Florida Statutes), elementary fiduciary duty concepts,

39

and established trust jurisprudence. These procedurally and substantively bankrupt assertions were deployed solely to inject procedural noise, complicate the docket, and prolong the litigation to maximize the cognitive and financial toll on Plaintiff. They include:

    i.    **The "Standing and Stalling" Gambit:** On April 8 and 9, 2026, Defendant Schulz, acting on behalf of Defendant Smith, filed a frivolous Motion to Dismiss and a parasitic Motion to Stay Discovery. This coordinated maneuver was designed solely to freeze the state court proceedings and block Defendant Smith's obligation to finally file an answer in the Florida State Court Lawsuit and respond to pending basic discovery. Defendants Schulz and Smith asserted a legally frivolous standing defense, arguing that Plaintiff, as sole beneficiary, could not sue his former trustee to recover converted and stolen trust assets despite the Florida Trust Act and the very case law cited by Defendants Schulz and Smith in their Motion to Dismiss expressly asserting that Plaintiff could do so. It also wholly ignored Plaintiff's direct individual tort claims. The state court denied the bad-faith Motion to Dismiss in its entirety on May 19, 2026 rendering the parasitic Motion to Stay Discovery moot.

    ii.    **Evasion of Absolute Statutory Accounting and Asset Tracing Obligations.** In further execution of the Enterprise's pattern of racketeering and affirmative concealment, Defendants Schulz and Smith systematically obstructed and defied Defendant Smith's absolute statutory accounting obligations under Florida Statute § 736.0813. This statutory mandate imposes an unconditional, non-delegable fiduciary duty to maintain and disclose transparent financial

40

records—a structural obligation that operates entirely independent of, and superior to, standard civil discovery rules. Rather than producing the verified ledgers required to enforce transparency, the Enterprise weaponized non-compliance to actively block the judicial tracing and use of Trust res transfers and obscure the downstream mechanics of the primary trust conversion and theft. By deliberately withholding these mandated financial disclosures and attempting to evade the rigorous jurisdictional safeguards designed to maximize enforcement and compliance across parallel proceedings, Defendants Schulz and Smith sought to exploit this artificial opacity to bridge critical gaps in their own litigation agenda. This total refusal to account was not an ordinary procedural delay, but a core tactical maneuver designed to insulate the illicitly converted Trust res from judicial tracing, frustrate concurrent enforcement efforts, and exhaust Plaintiff's resources and cognitive abilities. Defendants Schulz and Smith have refused to meet-and-confer or concede on this issue multiple times now. Defendant Schulz has put forth multiple arguments in opposition to this statutory requirement that fly in the face of the Florida Trust Act and basic fiduciary duties further evidencing his absolute lack of subject-matter competence described in Paragraph 62.d *supra*.

iii.        **The Perjurious Sham Answer:** As mentioned previously in Paragraph 62.c *supra*, on June 2, 2026, Defendant Schulz, acting on behalf of Defendant Smith, finally filed an unverified Answer and Affirmative Defenses nine and one-half (9.5) months after being served. The pleading asserted bad-faith "without knowledge" denials of facts uniquely within Defendant Smith's personal

41

knowledge, including: (A) his own sworn federal bankruptcy testimony and discovery admitting to converting and stealing $479,000.00 of Plaintiff's Trust res; (B) his own personal bank records and those of his LLC to which he diverted those monies; (C) approximately 91,000 text messages he personally exchanged with Plaintiff; and (D) Plaintiff's traumatic brain injury and permanent head injury, which was the very impetus for Plaintiff's Trust that Defendant Smith helped put in place in 2021. The sham answer also asserted ten legally bankrupt affirmative defenses, including the identical standing argument that court had rejected just 14 days prior. The sham answer is plainly the answer of Defendant Schulz and not that of his client Defendant Smith. On June 4, 2026, Plaintiff filed a Verified Motion to Strike the Answer as a Sham Pleading under Rule 1.150. Defendants Schulz and Smith failed to file any written objection, and following a July 14, 2026 hearing, the motion is pending a ruling by that court. In these filings, Defendant Schulz has even further evidenced his absolute lack of subject-matter competence described in Paragraph 62.d *supra*.

iv.      **The Summary Judgment Attrition Scheme, Deemed Admissions, and Procedural Default.** In an effort to bypass mandatory rules of civil procedure and escape an unassailable evidentiary record, the Enterprise engaged in a calculated campaign of litigation attrition to delay adjudication of Plaintiff's Motion for Partial Summary Judgment on Liability, which was filed and served on April 14, 2026. Under the strict mandates of revised Florida Rule of Civil Procedure 1.510(c)(5), the nonmovant's responsive window closed automatically 40 days later on May 24, 2026. Defendant Smith failed to file a

42

response, counter-affidavit, or objection within that window. Instead, the Enterprise allowed the deadline to expire and waited until June 2, 2026—nine days after default—to file an untimely Motion for Enlargement, subsequently followed by a Motion for Clarification/Correction on June 25, 2026, seeking an unauthorized 30-day retroactive window.

      A.    Under Florida Fourth District Court of Appeal's dispositive holding in *Lloyd S. Meisels, P.A. v. Dobrofsky*, 341 So. 3d 1131 (Fla. 4th DCA 2022), the word "must" in Rule 1.510 is absolute; trial courts completely lack the equitable discretion to retroactively forgive a wholesale failure to comply with the rule's mandatory operational terms, rendering any missed window an automatic procedural waiver.

      B.    The Enterprise's desperate reliance on out-of-time procedural lifelines is a direct response to a compounding, fatal evidentiary record that completely establishes their liability. On July 7, 2026, Plaintiff filed a Notice of Filing of Affidavits containing the sworn testimony of David Hartmann, Denise Levy, BSW, and William Scott Chapman, a true and correct copy of which is attached hereto as **Exhibit C-13**. These affidavits stripped away any lingering defense: Hartmann verified that the Special Needs Trust never authorized, executed, or had any involvement with the $336,970.00 in software development invoices routed to Landmark Lawns, LLC, while Levy and Chapman provided comprehensive testimonies establishing Defendant Smith's long-standing, real-time knowledge of Plaintiff's chronic traumatic brain injury (TBI),

43

permanent head injury, severe executive dysfunction, and extreme susceptibility / vulnerability to Defendant Smith's systematic grooming and financial exploitation.

C.     Compounding this factual ruin, on July 16, 2026, Plaintiff filed a Notice of Deemed Admissions, a true and correct copy of which is attached hereto as **Exhibit C-14**. Because Defendant Smith failed to serve any answers or objections to Plaintiff's March 24, 2026 First Consolidated Discovery Requests (a true and correct copy of which is attached hereto as **Exhibit C-15**) by the April 24, 2026 deadline, every core operational fact—including Smith's email confession to transferring over $424,000 in trust funds to fund his private LLC (a true and correct copy of which is attached hereto as **Exhibit C-16**), his absolute failure to provide a statutory accounting, and Plaintiff's legal status as a protected "vulnerable adult"—stands conclusively admitted as a matter of law under Florida Rule of Civil Procedure 1.370(a).

g.     **The Systematic Posture of Complete Failures to Respond: Multiplied Proceedings and Cascading Motions.** Building directly upon the automatic procedural defaults, strategic waivers, and bad-faith delay mechanisms detailed in Paragraph 62.f *supra*, the Enterprise's operational framework relies on a continuous, calculated pattern of complete failures to respond to pleadings, discovery mandates, and statutory obligations. Rather than advancing colorable legal defenses in the Florida State Court Lawsuit, Defendants Schulz and Smith utilize a defensive posture of systematic non-engagement, designed explicitly to force Plaintiff to expend his hyper-limited financial

44

and cognitive resources on corrective motion practice. This passive-aggressive attrition strategy has directly multiplied and extended the proceedings, resulting in a cascading sequence of further motions and severe procedural consequences:

i.       **The Motion to Compel Discovery and Deem Requests for Admissions Admitted:** As initially mentioned in Paragraph 62.f.iv.C *supra*, a direct consequence of Defendants Schulz and Smith's absolute failure to serve any answers, objections, or responses to Plaintiff's March 24, 2026 First Consolidated Discovery Requests by the mandatory April 24, 2026 deadline, Plaintiff was forced to file a comprehensive Motion to Compel Discovery and to Deem Requests for Admissions Admitted. Because the Enterprise elected to remain entirely silent rather than engaging in the discovery process, every core operational liability—including Smith's conversion and theft of trust assets and Plaintiff's status as a vulnerable adult—has stood conclusively admitted as a matter of law since April 24, 2026, culminating in Plaintiff's formal Notice of Deemed Admissions filed on July 16, 2026.

ii.      **The Motion to Strike Sham Answer:** Following the Enterprise's nearly ten-month delay, as initially mentioned in Paragraph 62.c *supra*, Defendant Schulz filed an unverified Answer and Affirmative Defenses on June 2, 2026, which flatly denied facts uniquely within his client's knowledge and prior oaths. In response to this bad-faith filing, Plaintiff was forced to file a Verified Motion to Strike the Answer as a Sham Pleading under Florida Rule of Civil Procedure 1.150 on June 4, 2026. True to their standard pattern of non-engagement and as initially mentioned in Paragraph 62.f.iii *supra*, Defendants Schulz and Smith

45

completely failed to file any written objection or response to the Motion to Strike, offering zero substantive defense through the conclusion of the July 14, 2026 state court hearing on that motion.

      iii.      **Plaintiff's Motion for Interim Beneficiary Attorneys' Fees and Costs:** On July 8, 2026, Plaintiff was forced to file a Motion for Interim Beneficiary Attorneys' Fees and Costs pursuant to Fla. Stat. § 736.1004 and the Court's inherent equitable authority under *Moakley v. Smallwood*, 826 So. 2d 221 (Fla. 2002) and *Bitterman v. Bitterman*, 714 So. 2d 356 (Fla. 1998), seeking an immediate liquidated interim award of $50,000.00 to fund the retention of specialized trust litigation counsel. The motion directly exposes the egregious, bad-faith structural disparity engineered by the Enterprise: while the vulnerable, head-injured Plaintiff is forced to litigate *pro se* because Defendant Smith stripped the Trust of its entire corpus, Defendant Smith continues to fund a scorched-earth defense against Plaintiff in three states while somehow in Chapter 13 Bankruptcy. Specifically, the motion references Defendant Smith's own sworn May 14, 2026 Bankruptcy Declaration, in which he admitted to secretly earning $10,100.00 in undisclosed, post-petition ice-storm mitigation income in January 2026, which he immediately funneled in $5,000.00 cash blocks to Defendant Schulz in Florida and Defendant Turk in Illinois—entirely bypassing mandatory Bankruptcy Court prior approval. Consistent with their systemic posture of non-engagement, Defendants Schulz and Smith completely failed to file any written response or objection to this motion. Following the July 14, 2026 hearing, that court took this

46

uncontested motion, and the Enterprise's silent default, under active judicial consideration.

iv. **The "Ostrich" Posture and Willful Blindness to the Evidentiary Record:** Throughout these multiplied proceedings, Defendant Schulz on behalf of Defendant Smith has repeatedly engaged in a calculated, bad-faith narrative of artificial ignorance, incessantly complaining that Plaintiff has failed to file, produce, or properly reference critical record evidence. Specifically, in open court on May 19, 2026 and in formal court filings on June 2, 2026, and June 25, 2026, Defendant Schulz repeatedly asserted that the "approximately 91,000 text messages" buttressing Plaintiff's claims "have not been produced" and that it is "currently unknown what is contained" within them. This manufactured narrative relies entirely on a defensive strategy of deliberate, willful blindness. In reality, these identical 91,000 contemporaneous text message party admissions have always been in the actual possession of Defendant Smith just as they are in the possession of Plaintiff. The text messages have also resided openly on the federal docket of Defendant Smith's Middle District of Tennessee Bankruptcy Court since November 26, 2025. Furthermore, Plaintiff explicitly integrated these records into the Florida State Court Lawsuit's evidentiary record on April 13, 2026, as Exhibit SLS-DECL-6 to his Verified Affidavit. Far from an unindexed mass, every single page of this data is paginated, and every individual message is numbered sequentially from 1 to 90,994. Defendants Schulz and Smith have had uninterrupted access to this devastating data for nearly a year: first through public federal dockets; second via Plaintiff's formal state court filings;

47

and third directly from his own client, Defendant Smith, who created the communications with Plaintiff between 2020 and 2025 and initially retained Defendant Schulz on August 20, 2025—more than six months before Defendant Schulz finally announced his representation of Defendant Smith on March 2, 2026. Defendant Schulz and Smith's ongoing refusal to read or comprehend this explicit record represents a textbook "Ostrich" strategy and a bad-faith failure to defend, engineered solely to evade clear-cut liabilities while falsely accusing the *pro se* Plaintiff of procedural non-production. A true and correct copy of relevant excerpts from which is attached hereto as **Exhibit C-17**—they are a "must read."

v.        **The Bad-Faith Avoidance of Meet-and-Confer Obligations and Refusal to Concede Devoid Positions:** Beyond a deliberate blindness to the record, Defendants Schulz and Smith have engaged in a continuous, multi-month pattern of tactical obstruction by repeatedly failing to meet and confer in good faith or concede legally bankrupt positions. Plaintiff has gone above and beyond his consultation prerequisites, repeatedly extending tailored stipulations designed to narrow issues, secure agreements, and protect finite judicial resources.

A.        This pattern of bad-faith avoidance began on April 11, 2026, when Plaintiff transmitted a draft Motion for Partial Summary Judgment and a liability stipulation rooted in Defendant Smith's own sworn federal bankruptcy admissions. Defendants Schulz and Smith flatly rejected the invitation the following day, entirely ignoring Defendant Smith's binding judicial estoppels and dismissing the sworn federal record

48

as "naked assertions." A true and correct copy of the foregoing is attached hereto as **Exhibit C-18**.

B.    This obstructive stance escalated as Defendants Schulz and Smith fell into total procedural default. On June 26, 2026, after Defendants Schulz and Smith failed to respond to both Plaintiff's summary judgment motion and outstanding discovery requests, Plaintiff proposed a comprehensive Stipulation for Entry of Unified Order to formalize these operationally locked defaults. Defendants Schulz and Smith summarily rejected the proposal that same afternoon, offering zero substantive feedback, legal objections, or counter-proposals. A true and correct copy of the foregoing is attached hereto as **Exhibit C-19**.

C.    In a further effort to isolate administrative issues, Plaintiff transmitted a heavily narrowed, standalone stipulation on June 30, 2026, limited exclusively to compelling the mandatory statutory trust accounting under § 736.0813, Fla. Stat. Defendants Schulz and Smith rejected this accommodation as well, relying on the legally frivolous assertion that a former trustee's absolute statutory duty to account somehow terminates upon that trustee's resignation.[11] A true and correct copy of the foregoing is attached hereto as **Exhibit C-20**.

D.    Finally, on July 9, 2026, ahead of a scheduled Uniform Motion Calendar hearing, Plaintiff made a final, ultra-narrow attempt to resolve the discovery impasse by sending a scaled-down proposal focused

---

[11] Yet another example of Defendant Schulz's absolute lack of subject-matter competence described in Paragraph 62.d *supra*.

strictly on outstanding discovery requests that were already conclusively deemed admitted by operation of law. Defendants Schulz and Smith completely ignored this good-faith outreach, remaining 100% silent. A true and correct copy of the foregoing is attached hereto as **Exhibit C-21**.

E.       Defendants Schulz and Smith's ongoing "do nothing, say nothing, ignore, delay" approach demonstrates a complete abdication of the meet-and-confer process, forcing an unnecessary expenditure of judicial resources on clear-cut legal mandates because the Enterprise simply refuses to concede positions for which it possesses no good-faith arguments.

64.     **The Tactical Role of Defendant Turk in the Illinois Replevin Lawsuit Enterprise Attrition Scheme:** Identical to the bad-faith, coordinated maneuvers executed by Defendants Slocum and Schulz, Defendant Turk's involvement in the Illinois Replevin Lawsuit represents a calculated, passive-aggressive campaign of deliberate delay, tactical non-engagement, and systemic obstruction in furtherance of the Enterprise. This posture was designed not to assert a colorable, good-faith defense, but to bypass federal bankruptcy oversight, insulate Plaintiff's personal property from lawful recovery, and financially and cognitively exhaust the disabled Plaintiff. Specifically, Defendants Turk and Smith systematically advanced the Enterprise's objectives through the following chronological and operational steps:

a.       **Unauthorized Prior Capitalization and Stealth Retention:** Operating with full, subjective knowledge of Defendant Smith's pending Tennessee bankruptcy and Defendant Slocum's representation therein, Defendant Turk executed a retainer

50

agreement capitalized without mandatory prior Bankruptcy Court approval entirely by illicitly diverted bankruptcy estate cash. Specifically, Defendant Turk accepted a $5,000.00 unauthorized post-petition distribution via cashier's check—derived from Defendant Smith's secret, unreported January 2026 earnings—without obtaining the mandatory prior authorization of the Bankruptcy Court required by 11 U.S.C. § 327(e).

b.      **The Procedural Bottleneck and Deliberate Non-Engagement:** Upon entering the Illinois Replevin Lawsuit (Case No. 2026CH1), Defendant Turk implemented a defensive strategy of near-total non-engagement to stall the litigation and create an administrative bottleneck. Since February 2, 2026, Defendant Turk refused to file any responsive pleadings or substantively participate in the action, choosing instead to file absolutely nothing in that case other than a baseline Notice of Appearance on February 2, 2026 and a very belated answer on June 26, 2026. This calculated silence deliberately extended the proceedings and multiplied the administrative burden on the pro se Plaintiff.

c.      **Advancing Claims in Direct Contradiction of Sworn Party Admissions:** Despite a total absence of viable legal or factual defenses, Defendant Turk and Defendant Smith actively advanced groundless, bad-faith written assertions in the Jackson County, Illinois court demanding that approximately $8,400 of Plaintiff's personal property admitted to be Plaintiff's and in the actual possession of Defendant Smith simply be "awarded to Defendant Smith" for no rational or explained reason. This position stands in flagrant, irreconcilable contradiction to Defendant Smith's own explicit admissions under oath. Specifically, during his October 16, 2025, § 341 Creditor's Meeting, Defendant Smith openly testified under oath that the large safe located in his

51

Makanda, Illinois basement, the half-bag of junk silver coins held within it, and the collection of rifles, shotguns, handguns, magazines, and ammunition in his possession all belong entirely and exclusively to Plaintiff.

d. **Obstruction of Law Enforcement and Asset Recovery:** Armed with bankruptcy estate funds not approved in advance as required, Defendant Turk has utilized his representation of Defendant Smith to ring-fence these admitted assets and actively block the local sheriff from executing property recovery efforts for which Plaintiff obtained an *ex parte* emergency TRO court order on January 21, 2026 to effectuate, a true and correct copy of which is attached hereto as **Exhibit C-22**. By managing this obstructionist shield, Defendant Turk has successfully prevented the recovery, liquidation, and sale of Plaintiff's personal property from which Plaintiff could live on temporarily.[12] This tactical freeze has directly advanced the Enterprise's central objective: locking the vulnerable, head-injured Plaintiff into a state of absolute financial destitution and depriving him of the essential resources needed to fund his life efforts, secure housing, obtain necessary medical care, and secure legal representation against: Defendant Smith in the Florida State Court Lawsuit, his fraudulent Tennessee Bankruptcy Case, and the Illinois Replevin Lawsuit; and the Enterprise Defendants in this lawsuit.

e. **Manufacture of Commercial Impossibility and Further Exploitation of Indigency:** The Enterprise has further advanced its campaign of attrition by exploiting the structural mechanics of the Illinois court's recovery mandates to engineer an

---

[12] Plaintiff notes for the record that Defendant Smith turned over a portion of Plaintiff's assets in his possession to the local sheriff on or around February 9, 2026 (which Plaintiff's agent drove from Memphis, TN to recover from the local sheriff on February 13, 2026). Defendant Smith subsequently turned over a nominal portion of Plaintiff's ammunition in his possession to the local sheriff on February 20, 2026, but nothing more since then. Plaintiff's comprehensive and detailed list of his assets still in the possession of Defendant Smith was filed in the Illinois Replevin Lawsuit on May 2, 2026.

insurmountable financial bottleneck. Specifically, that judge has twice ordered Plaintiff to blindly coordinate the extraction of his 1,360-pound Fort Knox safe and find specialized safe movers to drive to rural southern Illinois to recover it from Defendant Smith's basement at Plaintiff's own expense—orders issued despite the record showing and that court being aware that Plaintiff is completely broke and facing absolute economic paralysis due to Defendant Smith systematically converting and stealing the entirety of Plaintiff's Trust res while serving as his trustee. To comply with these directives, Plaintiff has exhaustively contacted over thirty (30) moving companies since March 2026 ranging across St. Louis, Louisville, Memphis, Nashville, Chicago, and a specialist in Wisconsin. Due to the extreme physical liability and operational risk engineered entirely by the Enterprise, only two (2) operators have stated they would even consider performing this potential recovery project. This near-total commercial blockade is a direct consequence of the safe's massive weight, the remote and hazardous terrain, and Defendant Smith's overt hostility, including his absolute refusal to provide the vault combination or permit basic photographs of the basement access points and outside terrain required for moving logistics. These remaining willing commercial operators require an upfront fee between $2,000 and $3,000 to attempt the blind extraction, a sum that is fundamentally impossible for the indigent Plaintiff to satisfy. By refusing to execute a simple possession stipulation for an asset Defendant Smith has already admitted under oath belongs exclusively to Plaintiff and have local sheriff seize and recover the safe or have Defendant Smith pay for its removal from his possession, the Enterprise deliberately utilizes this physical and financial blockade to paralyze Plaintiff's recovery efforts and freeze the assets necessary to sustain his basic life functions.

53

65.     **The Inter-State Mail and Wire Fraud Pipeline (18 U.S.C. §§ 1341, 1343):** To execute the scheme without detection by the Chapter 13 Trustee or the U.S. Trustee (to the extent they were even paying any attention to Defendants Smith and Slocum notwithstanding Plaintiff's repeated warnings in writing to them regarding their actions in violation of the Bankruptcy Code), the Enterprise utilized interstate wire transmissions and/or postal channels to move laundered funds and file contradictory or evasive / intentionally delaying state court pleadings.

66.     **The Cashier's Check Pipeline:** In January 2026, Defendants utilized interstate banking channels to launder the unreported $10,100.00 estate asset, splitting it into specific cashier's checks. These instruments were transmitted across state lines to fund the unapproved retainers of Defendant Schulz in Florida and Defendant Turk in Illinois.

67.     **Electronic Filing of Contradictory Admissions:** Defendants routinely used electronic court filing systems (wires) to transmit pleadings, motions, and notices into the Middle District of Tennessee Bankruptcy Court, the Palm Beach County Circuit Court, and the Jackson County, Illinois Circuit Court. These filings advanced multiple procedural bottlenecks (and the efiling of a sham answer in the Florida State Court Lawsuit) that directly denied facts already admitted under oath in federal bankruptcy filings and documented via nearly 91,000 text message party admissions between Defendant Smith and Plaintiff across 2020 to 2025.

B.     **Relationship and Continuity (The RICO Nexus)**

68.     **Horizontal Relationship:** The predicate acts are intrinsically related because they share the exact same participants (Defendants Slocum, Schulz, Turk, and Smith), the exact same victim (the disabled and vulnerable Plaintiff), and the exact same method of commission (the unapproved, secret diversion of bankruptcy estate assets via cashier's checks to fund a multi-front "scorched earth" war of attrition against Plaintiff).

69. **Open-Ended and Closed-Ended Continuity:** The Enterprise's racketeering pattern satisfies the element of continuity under both established legal standards:

a. **Closed-Ended Continuity:** Defendants have engaged in a sustained, highly organized course of fraudulent conduct spanning from August 2025 through the present date, executing a high volume of distinct fraudulent, deceptive, evasive court filings in three states replete with omissions, falsehoods and patently conflicting with Defendant Smith's prior court filings and statements under oath and tens of thousands of his party admissions, as well as the financing of that Enterprise as described multiple times herein specifically designed to grind down a single, vulnerable, medically impaired and destitute creditor and former Trust beneficiary.

b. **Open-Ended Continuity:** The racketeering pattern poses a distinct threat of long-term, ongoing repetition. Because Defendant Smith's primary liabilities are completely indefensible on the merits, the Enterprise's standard operating procedure relies inherently on maintaining an unapproved, illegally funded defense network to perpetuate a multi-front informational blackout and offense against the single, vulnerable, medically impaired and destitute Plaintiff. The threat of ongoing fraud remains active on the dockets of Florida, Illinois, and Tennessee unless and until halted by this Court.

C. **The Structural Architecture of the Association-in-Fact Enterprise: The Hub, Spokes, and Connecting Rim**

70. **The Hub and Primary Spokes:** The Enterprise operates as an association-in-fact wheel:

a. **The Hub:** Defendant Smith serves as the central hub, acting as the primary underlying tortfeasor, the converting trustee, and the common client through whom all financial and procedural operations pass.

55

b. **The Operational Co-Hub / Architect:** Defendant Slocum operates as the structural co-hub and legal architect, utilizing his position in the Middle District of Tennessee Bankruptcy Court to maintain an illegitimate Chapter 13 shield and manage the central financial gatekeeping.

c. **The Jurisdictional Spokes:** Defendant Schulz (operating as the Florida litigation conduit) and Defendant Turk (operating as the Illinois asset-freeze conduit) function as the outer operational spokes executing extra-jurisdictional defense maneuvers.

71. **The Unifying Rim (Mutual Coordination and Cross-Awareness):** The Enterprise is not a series of disconnected, independent legal representations. Rather, a distinct, binding "rim" connects Defendants Slocum, Schulz, Turk, and Smith into a cohesive, single association-in-fact enterprise through the following operational facts:

a. **The Shared Financial Pipeline:** Defendants Schulz and Turk did not receive independent, arms-length retainers from separate client sources. Both spokes were initially capitalized out of a single, unified $10,100.00 block of unreported post-petition bankruptcy estate cash generated by Defendant Smith in January 2026. The funds were split into identical $5,000.00 cash blocks and transmitted via cashier's checks across state lines to Schulz in Florida and Turk in Illinois.

b. **Centralized Bankruptcy Coordination and Structural Timeline:** The Enterprise's cross-coordination is established through an unbroken chronological arc of joint procedural maneuvering:

i. **Phase I (Emergency Shield & Inception):** On August 17, 2025, Plaintiff served Defendant Smith in the Florida State Court Lawsuit. Within nine

days, Defendant Smith retained Defendant Schulz (August 20, 2025) and Defendant Slocum (August 26, 2025). On August 28, 2025, Defendant Slocum filed Defendant Smith's Chapter 13 Petition in the Middle District of Tennessee, explicitly listing the Florida State Court Lawsuit on the bankruptcy schedules. Upon information and belief, during this August 2025 window, Defendants Slocum and Schulz communicated and coordinated directly, or through Defendant Smith as a common conduit, to deploy the Chapter 13 automatic stay as an offensive weapon to freeze and delay the Florida State Court Lawsuit.

     ii.     **Phase II (Formalized Multi-Spoke Alignment):** The operational coordination between the central hub (Defendant Slocum) and the outer spokes (Defendants Schulz and Turk) culminated on April 20, 2026. On that date, Defendant Slocum filed dual Motions to Appoint Attorney / Motions to Approve Payment of Fees and Expenses in the Middle District of Tennessee Bankruptcy Court on behalf of both Defendant Schulz and Defendant Turk.

     iii.     The April 20, 2026 filings contained signed engagement agreements for their representation of Defendant Smith alongside separately filed formal Affidavits in support thereof executed individually by Defendants Schulz and Turk. These filings confirm that Defendants Slocum, Schulz, and Turk were in direct communication, actively sharing legal documents across state lines, and mutually agreeing to utilize Defendant Slocum's bankruptcy umbrella to formalize their roles and retroactively (*nunc pro tunc*) legitimize their unauthorized fee receipts.

c.      **Coordinated Multi-Front Non-Engagement Strategy:** The spokes do not act in isolation. Defendant Schulz in Florida and Defendant Turk in Illinois deployed an identical, highly synchronized playbook of deliberate non-engagement, delayed entries, and refusal to file substantive answers or comply with statutory disclosures. This parallel conduct was explicitly calculated to create overlapping, multi-state procedural bottlenecks to paralyze the pro se Plaintiff.

d.      **Shared Knowledge of the Common Unlawful Purpose:** Each Defendant knew that Plaintiff's Florida State Court Lawsuit represented over 80% of Defendant Smith's total creditor body, and that a judgment in Florida would collapse the Tennessee bankruptcy shield, trigger the immediate recovery of Plaintiff's personal property in Illinois, disgorge them of their illicit fees, bring their representation of Defendant Smith and the whole Enterprise to an end, and expose them personally and professionally to material financial and licensing repercusions. The spokes actively cross-referenced and relied upon each other's dockets—using the Tennessee bankruptcy stay to freeze Florida and Illinois, while using Florida and Illinois filings to justify the continued maintenance of the bad-faith Tennessee bankruptcy.

72.     This mutual awareness, shared financial capitalization, and interlocking procedural strategy form an undeniable rim enclosing the hub and spokes, establishing a continuous, single association-in-fact Enterprise under 18 U.S.C. § 1961(4).

**D.      Proximate Cause and Economic Injury Under 18 U.S.C. § 1964(c)**

73.     As a direct and proximate result of Defendants' coordinated pattern of racketeering activity, Plaintiff has suffered concrete, quantifiable, and non-speculative injuries to his property and business interests within the meaning of 18 U.S.C. § 1964(c).

74. Furthermore, the Enterprise's coordinated procedural bottlenecks have systematically blocked the recovery, sale, and liquidation of Plaintiff's personal property currently held by Defendant Smith in Illinois. This targeted strategy has locked Plaintiff into a state of absolute financial destitution, compounding his cognitive vulnerabilities and stripping Plaintiff of the financial capacity to obtain necessary medical care and avoid living in his car yet again.

75. **Establishment of Second, Distinct Set of Post-Petition Injuries:** Independent of Defendant Smith's initial pre-petition conversion and civil theft of the $478,920.33 Trust res and other counts pled in the Florida State Court Lawsuit, the post-petition racketeering conduct of the Enterprise has directly inflicted a second, distinct category of economic injuries upon Plaintiff's property rights across four concrete operational heads:

   a. **Depletion and Siphoning of Bankruptcy Estate Distributable Assets:** By bypassing federal maximum thresholds under 11 U.S.C. § 109(e), controls under 11 U.S.C. § 327(e) and § 1306, and laundering estate funds through out-of-state conduits, the Enterprise successfully diverted cash assets that should have been under the administration of the bankruptcy court for distribution to satisfy Plaintiff's allowed Claim No. 7 (the Florida State Court Lawsuit) and Claim No. 9, if not requiring the outright immediate dismissal of Defendant Smith's bankruptcy petition *ab initio* with prejudice. These funds constituted property of the estate that should have been preserved to satisfy Plaintiff's allowed Claim No. 7 (the Florida State Court Lawsuit) and Claim No. 9. The Enterprise's unauthorized diversion of cash directly depleted the finite asset pool available for distribution to creditors, reducing Plaintiff's quantifiable financial recovery *pro tanto*.

b.     **Direct Costs and Expenses of Litigating the Bad-Faith Bankruptcy:**
The Enterprise's intentional filing and maintenance of a statutorily ineligible Chapter 13 bankruptcy—maintained through false oaths, omitted schedules, and bad-faith *nunc pro tunc* employment applications—forced Plaintiff to expend hundreds of hours of administrative time, out-of-pocket litigation expenses, and finite cognitive resources to police the Middle District of Tennessee docket. Plaintiff was forced to draft corrective filings, uncover concealed post-petition earnings, expose undisclosed retainers, and defend against unauthorized fee distributions. These out-of-pocket costs and administrative expenditures represent direct, compensable economic injury under Civil RICO. Furthermore, the filing of Defendant Smith's Tennessee Bankruptcy Petition caused Plaintiff's retained counsel in the Florida State Court Lawsuit to lose interest in pursuing that case due to concerns about a prompt recovery from Defendant Smith in order to pay their fees—resulting in their withdrawal from representing Plaintiff in the Florida State Court Lawsuit in December 2025 forcing Plaintiff to have handle that case as well pro se all while completely broke and having no ability to pay for housing, necessary medical care, or the costs and expenses associated with three lawsuits in three states against Defendant Smith where he somehow can afford his Enterprise of lawyers to defend himself while in a minimal Chapter 13 bankruptcy case.

c.     **Direct Costs of Opposing the Bad-Faith Defense in the Florida State Court Lawsuit:** The Enterprise deployed laundered estate cash without mandatory prior Bankruptcy Court approval to fund Defendant Schulz's campaign of deliberate non-engagement, bad-faith motions to dismiss, an unverified, eleventh-hour "sham" answer, and a wholly vacuous objection to summary judgment for months. This bad-faith defense

posture forced Plaintiff to incur substantial costs and out-of-pocket expenses to draft

Motions to Compel Discovery, Verified Motions to Strike Sham Pleadings, Motions for

Partial Summary Judgment, supporting documents related thereto, and attend multiple

corrective hearings in the Circuit Court of Palm Beach County. These unnecessary

litigation costs were directly caused by the Enterprise's illegal capitalization of out-of-

state defense counsel who, upon information and belief, has zero prior probate, trust

litigation or fiduciary duty defense experience—thus even further compounding

Plaintiff's costs and expenses correcting all those errors and mistakes of fact, rule, statue,

caselaw and equity.

d. **Active Blocking, Freeze, and Devaluation of Illinois Property**

**Recovery:** The Enterprise's deployment of Defendant Turk in the Jackson County,

Illinois Replevin Lawsuit—funded by an unauthorized $5,000.00 cashier's check—

successfully engineered a procedural freeze over Plaintiff's personal property (including

the 1,360-pound Fort Knox safe, junk silver coins, firearms, thousands of rounds of

ammunition, and storage bins). By actively blocking law enforcement recovery efforts,

refusing to provide vault combinations, and compelling Plaintiff to navigate impossible

commercial moving logistics from out-of-state while indigent, the Enterprise directly

deprived Plaintiff of the immediate possession, use, liquidation value, and economic

benefit of his property, locking him into a state of total financial paralysis.

E.  **The "Ostrich" Posture: Willful Blindness and Sham Non-Engagement as Affirmative Acts of Co-Conspiracy**

1.  **The Legal Doctrine of Willful Blindness (The "Ostrich" Principle)**

76.  The law does not permit a co-conspirator to escape liability by burying their head in the sand. Under long-standing federal jurisprudence, willful blindness—frequently referred to as the "Ostrich" doctrine—is the legal equivalent of actual, subjective knowledge.

77.  When a defendant is aware of a high probability of illegal conduct or fraudulent activities but takes deliberate steps to associate with the scheme and avoid learning the truth, they possess the requisite *mens rea* for conspiracy.

78.  Here, Defendants Slocum, Schulz, and Turk did not merely defend a client; they engaged in a calculated strategy of conscious avoidance. Surrounded by glaring red flags—including the blatant statutory ineligibility of Smith's Chapter 13 filing, the lack of Bankruptcy Court approval under 11 U.S.C. § 327(e), Defendant Smith's admissions under oath and party admissions contained in the 91,000 text messages between Plaintiff and Defendant Smith from 2020-2025, and the obvious conversion and theft of Plaintiff's Trust res and breaches of fiduciary duties to Plaintiff—these Defendants chose to close their eyes to the criminal and fraudulent nature of the Enterprise's operations so they could continue to pocket their fees. In federal conspiracy law, a closed eye is an agreeing mind.

2.  **The Tactical Architecture of the "No-Defense" Defense**

79.  Defendants' consistent, uniform refusal to substantively engage with Plaintiff's claims is not a legitimate defense strategy; it is a weaponized litigation posture. By executing a "no engagement / no defense" playbook, Defendants Slocum, Schulz and Turk systematically abuse the judicial process to achieve the Enterprise's primary objective: the economic and physical exhaustion of Plaintiff.

80.    The strategy is as follows:



Uncontestable Trust Theft / Fraud / Unjustifiable Retention of Plaintiff's Personal Property

▼

Defendants Adopt "Ostrich" Silence / Refuse to Concede

▼

Forces Plaintiff to File Extensive, Corrective Motions & Seek Multiple Hearings Thereon

▼

Defendants Cry "Over-Filing" & "Victimization" to the Courts

▼

Result: Judicial Delay and Irritation with *Pro Se* Plaintiff, Asset Depletion, Worsening of Head Injury, and Procedural Obfuscation

81.    This sequence is not "zealous advocacy." It is the litigation equivalent of a rope-a-dope strategy funded by bankruptcy estate cash. By refusing to concede undisputed facts and Defendant Smith's sworn and party admissions, respond to pleadings, discovery and motions, or withdraw when their conflict and funding illegalities are laid bare, Defendants force Plaintiff to expend hundreds of hours in motion practice. They then weaponized the resulting volume of filings to paint Plaintiff as "vexatious" or "hyper-litigious" pro se plaintiff[13] to busy jurists who

---

[13] To remind the Court, while Plaintiff is a disabled individual who suffers from a severe, incapacitating head injury, Plaintiff was Editor-in-Chief of his Law Review while attending his Top 20 at the time law school, and practiced law at Latham & Watkins for many years before leaving the law in 2004. Plaintiff is not a lawyer and has not been licensed to practice anywhere since 2004. As soon as Plaintiff is able to retain a lawyer to represent him, Plaintiff will do so. But for Defendant Smith stealing Plaintiff's entire Trust res, Plaintiff would be able to afford counsel and not have to proceed *pro se*. Plaintiff also obtained a MBA in Finance contemporaneously with his JD from 1993-1997 in what was at the time a Top 20 MBA program.

lack the time to dive into the dense history of the fraud and Defendant Smith's twice admitted under oath to having converted and stolen Plaintiff's Trust res leaving Plaintiff with nothing in 2025. This is a deliberate, coordinated effort to choke the courts' dockets with procedural white noise so the substantive fraud and resulting estate depletion are never addressed on the merits.

### 3.      The Financial Mechanics of the Ostrich Squeeze

82.      A silent defense is incredibly cheap to run at least initially, while an offensive effort to uncover truth is "violently expensive." Defendants Slocum, Schulz and Turk's non-engagement strategy is explicitly designed to exploit this asymmetry.

   a.      For Defendants: Their "do-nothing" posture requires minimal billable effort, allowing them to preserve and stretch the pool of laundered, *nunc pro tunc* approved bankruptcy estate assets they have quietly hoarded.

   b.      For Plaintiff: Uncovering hidden earnings, tracing cashier's checks, and correcting the record after every misleading or evasive defense filing or entirely failing to file requires an immense expenditure of resources.

83.      The Ostrich defense is therefore the primary mechanism by which the Enterprise loots Chapter 13 estate assets to fund a financial cudgel against Plaintiff. Every day Defendants Slocum, Schulz, and Turk stall, delay, or ignore a motion or basic discovery is another day they drain Defendant Smith's bankruptcy estate of post-petition funds approved *nunc pro tunc* in clear violation of *Acevedo*, while Plaintiff is bled dry financially and cognitively trying to force basic compliance with federal and state law.

### 4.      Direct Facilitation of the RICO Conspiracy (18 U.S.C. § 1962(d))

84.      To be liable under RICO conspiracy, a defendant does not need to have conceived the fraud or directed the enterprise. They only need to have agreed to facilitate the scheme.

85.    Defendants Slocum, Schulz and Turk's participation in this "Ostrich" strategy constitutes direct, physical facilitation of the conspiracy in three ways:

a.    **Concealment of Predicate Acts:** By failing to produce mandatory disclosures, ignoring post-petition reporting requirements and extra earnings, and failing to file any sort of substantive or responsive filings resulting in hearings filled with ambush and surprise, they actively conceal the predicate acts of bankruptcy fraud and money laundering from the court and creditors.

b.    **Asset Insulation:** Their defensive stalling tactics act as a legal firebreak, preventing Plaintiff from reaching and recovering his Trust res from Defendant Smith before any hearing and ruling on the merits can occur.

c.    **Sanctuary Provision:** They provide a litigation safe harbor for Defendant Smith. By acting as his institutional shields, they allow him to remain in bankruptcy-protected limbo, enjoying the fruits of his pre-petition thefts from Plaintiff while they fight a war of attrition on his behalf.

## V.    INDEPENDENT RICO COUNTS

### COUNT I:    VIOLATION OF 18 U.S.C. § 1962(c)
### (Conducting the Affairs of a Racketeering Enterprise)
### (Against All Defendants)

86.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

87.    In direct furtherance of the Enterprise's operational scheme, Defendants routinely conducted and participated in the affairs of the Enterprise through the highly coordinated tactical strikes detailed extensively in Section III.C herein. These actions—designed to trigger a cognitive or other breakdown of Plaintiff before any hearings on the merits—constitute a

continuous, intentional pattern of using fraudulent legal mechanics as a shield for illicitly converted Trust assets and intentional retention of Plaintiff's personal property, stepping completely outside the boundaries of legitimate legal representation.

88.   The conduct of all named Defendants in managing and conducting the affairs of this Enterprise was not merely procedurally improper but constituted active, actual fraud and a targeted, deliberate scheme to inflict a willful and malicious injury upon Plaintiff's property and civil litigation rights.

89.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his property and is entitled to recover threefold the damages sustained, alongside the costs of the suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT II:   VIOLATION OF 18 U.S.C. § 1962(d)
### (Conspiracy to Violate Civil RICO)
### (Against All Defendants)

90.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

91.   **The Conspiratorial Agreement:** Beginning no later than August 2025 and intensifying through the June 2026 multi-state court deadlines and hearings, Defendants knowingly, willfully, and unlawfully conspired to violate 18 U.S.C. § 1962(c). Each Defendant agreed to facilitate a scheme where:

    a.   A statutorily ineligible bankruptcy shield would be maintained by fraud and false oaths;

b.    *Nunc pro tunc* employment of Florida and Illinois counsels was sought —

and erroneously granted[14] over Plaintiff's ongoing appellate objections—to the tune of

hundreds of thousands of dollars merely in the next few months against a confirmed

bankruptcy plan valued at only $132,000 to oppose Defendant Smith's greater than 80%

creditor for the self-declared benefit of Defendant Smith himself and not his bankruptcy

estate or creditors; and

c.    Unreported post-petition estate cash was systematically laundered through

cashier's checks to fund an unapproved-at-the-time[15] legal network outside the

jurisdiction of the bankruptcy court.

92.    **Awareness of the Traumatic Scope:** Each member of the Enterprise entered into

this conspiratorial alliance with full, granular knowledge that the underlying conversion and civil

theft of the Trust res, breach of fiduciary duties, exploitation of a vulnerable adult, and

intentional infliction of emotional distress by Defendant Smith to Plaintiff, as well as Defendant

Smith's continuation refusal to turnover Plaintiff's personal property in his possession, were and

are legally indefensible on the merits due to Defendant Smith's prior admissions under oath at a

minimum.

93.    Defendants Slocum, Schulz, and Turk explicitly agreed to lend their professional

licenses and administrative access to court electronic filing systems to execute highly timed,

overlapping procedural strikes. They did so with complete awareness that the direct, intended

consequence of their coordinated actions was to trigger cognitive exhaustion and complete

---

[14] In direct violation of the U.S. Supreme Court's clear ruling in *Roman Catholic Archdiocese of San Juan v. Acevedo*, 589 U.S. 293 (2020). *See* footnote 1.
[15] *See* footnote 1 again.

financial destitution for a vulnerable adult suffering from a severe, daily progressing head injury for almost ten (10) years now.

94.    Each Defendant entered into this conspiratorial agreement with the specific, malicious intent to advance a fraudulent bankruptcy shield and launder estate property and prior knowledge of Plaintiff's Florida trust lawsuit previously served upon Defendant Smith, thereby directly executing actual fraud and conspiring to inflict a targeted, willful, and malicious injury to Plaintiff's allowed claims and property interests all with total prior knowledge of Plaintiff's cognitive limitations, status as a vulnerable adult, and complete financial destitution as a result of Defendant Smith's conversion and theft of Plaintiff's entire Trust res while serving as Plaintiff;s Trustee.

95.    As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property and is entitled to recover threefold the damages sustained, alongside the costs of the suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT III:  EXPLOITATION OF A VULNERABLE ADULT
### (Fla. Stat. §§ 415.1111, 825.103)
### (Against All Defendants)

96.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

97.    Liability under this Count is asserted against Defendant Smith for primary asset conversion, and distinctly against Defendants Slocum, Schulz, and Turk for knowingly creating and executing a concerted campaign to exploit Plaintiff's known cognitive vulnerabilities using unapproved-in-advance estate assets and bad faith tactics.

98.    **Establishment of Protected "Vulnerable Adult" Status by Operation of Law:**

a.    At all times material to this Complaint, Plaintiff was and remains a "vulnerable adult" within the statutory definitions of Fla. Stat. § 415.102(28) and Fla. Stat. § 825.103, suffering from a severe traumatic brain injury sustained on September 25, 2016 and the long-term, incapacitating effects of the head injury resulting therefrom.

b.    Plaintiff's status as a protected vulnerable adult exists as a matter of law, established by:

i.    The formal creation and execution of the Steven Lewis Scesa Special Needs Trust on February 11, 2021;

ii.    Defendant Smith's voluntary assumption of fiduciary duties as Trustee subject to express spendthrift and anti-self-dealing restrictions under Sections 3.2.3 and 5.1.5.1.17 of the Trust Agreement on February 9, 2023;

iii.    Defendant Smith's long-standing confidential relationship and direct pre-trust participation in the September 9, 2020 Symptoms Summary evaluation, a true and correct copy of which Plaintiff shall file under seal solely for this Court's *in camera* review due to the extreme sensitive medical nature of its content and ready ability for it to be further weaponized against Plaintiff by Defendants as well as anyone else who might happen to discover it;

iv.    Binding judicial admissions established in Florida State Court Lawsuit (including Deemed Admission No. 5); and

v.    Hundreds if not thousands of party admissions by Defendant Smith contained within the 91,000 text message archive spanning 2020 through 2025.

c.    All Defendants—including the attorney co-Defendants—received actual and constructive notice of this statutory status and the underlying Florida State Court Lawsuit record.

d.    Notwithstanding this actual notice, Defendants knowingly combined, conspired, and acted in concert to exploit Plaintiff's known cognitive limitations, extracting over $478,920.33 in unauthorized transfers and deploying procedural attrition to defeat Plaintiff's legal recourse, in direct violation of Fla. Stat. § 415.1111 and federal Civil RICO provisions.

99.    **Binding Judicial Determination of Vulnerable Adult Status and Exploitation (Exhibit C-8):** On July 29, 2026, the court in the Florida State Court Lawsuit entered summary judgment on liability against Defendant Smith under Count V (Exploitation of a Vulnerable Adult), Exhibit C-8, formally adjudicating that:

a.    Plaintiff sustained a severe traumatic brain injury (TBI) in 2016 resulting in ongoing neurological impairments;

b.    Defendant Smith possessed actual prior knowledge of Plaintiff's TBI and resulting vulnerabilities before accepting the trusteeship; and

c.    Defendant Smith is statutorily liable for exploitation of a vulnerable adult under Florida law.

100.    At all times relevant, Plaintiff was a "vulnerable adult" as defined by Fla. Stat. § 415.102, suffering from a severe, incapacitating head injury. This status was known to all Defendants through the explicit terms of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021, and the history of pleadings filed in the Florida State Court Lawsuit.

70

101. Defendant Smith, as former Trustee, stood in a position of trust and confidence with Plaintiff and had a fiduciary duty to manage the Trust res for Plaintiff's benefit and explicitly in no way, shape or form ever to or for the benefit of Plaintiff's trustee under both Florida trust law and the express terms of the Trust agreement.

102. Distinct from Defendant Smith's primary physical conversion of the Trust res, Defendants Slocum, Schulz, and Turk independently committed "exploitation" under Fla. Stat. § 825.103(1)(c) by knowingly accepting, holding, and deploying illicitly diverted post-petition bankruptcy estate assets—funds legally required to be preserved for Plaintiff's baseline survival, medical care, and housing—to capitalize a bad-faith litigation bottleneck specifically calculated to exploit Plaintiff's known cognitive impairments, severe head injury, and total indigency.

103. Defendants Slocum, Schulz, and Turk, acting in concert with Defendant Smith, engaged in the bad-faith concealment, diversion, and deployment of assets belonging to the bankruptcy estate—specifically including the initial undisclosed and unapproved laundering of the $3,950.00 pre-petition retainer to address issues with Plaintiff and the $10,100.00 post-petition cash income—knowing that these funds constituted part of a finite estate asset pool that legally should have been preserved for the distribution and satisfaction of Defendant Smith's creditors including Plaintiff's allowed claims, and which were and are instead essential to stabilize and preserve Plaintiff's life, medical care, and housing.

104. By executing actual fraud and laundering these estate assets through secret channels to fund a predatory, multi-front defensive apparatus designed to harass and exhaust a known vulnerable adult—a scheme the Defendants subsequently sought to sanitize through legally deficient, *nunc pro tunc* employment motions currently subject to federal appeal—

71

Defendants engaged in the "exploitation" of Plaintiff within the meaning of Fla. Stat. § 825.103(1)(c).

105. Defendants' actions were willful, malicious, and committed with the specific intent to deprive Plaintiff of his property and support.

106. Pursuant to Fla. Stat. § 415.1111, Plaintiff is entitled to actual damages, reasonable attorneys' fees, and costs of the action, and because Defendants' conduct was malicious, punitive damages are warranted and cumulative to any other remedies under this complaint.

### COUNT IV:   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (Against All Defendants)

107. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

108. Liability under this Count is asserted based on distinct, outrageous conduct: as to Defendant Smith, the deliberate stripping of Plaintiff's entire life savings; and as to Defendants Slocum, Schulz and Turk, the intentional weaponization of litigation to exacerbate Plaintiff's severe head injury while funded by unapproved-in-advance estate assets and bad faith tactics.

109. Defendants engaged in an ongoing, multi-jurisdictional campaign of litigation abuse, bankruptcy fraud, and the calculated, bad-faith diversion of bankruptcy estate assets to fund an extra-jurisdictional defense apparatus. This systematic manipulation of the Middle District of Tennessee bankruptcy machinery was specifically designed to weaponize federal court delays cascading into the Florida State Court Lawsuit and Illinois Replevin Lawsuit, forcing the complete cognitive and financial collapse of a disabled, vulnerable adult and former trust beneficiary whose entire trust assets were converted and stolen by Defendant Smith during his service as Plaintiff's trustee between July 2023 and March 2025.

110. Distinct from Defendant Smith's initial financial theft, the conduct of Defendants Slocum, Schulz, and Turk crosses the threshold of extreme and outrageous conduct exceeding all bounds of decency tolerated in a civilized society because they knowingly weaponized an illegal, unapproved-in-advance post-petition cash pipeline to fund a multi-state war of cognitive attrition against a severely head-injured, indigent pro se litigant with the specific, deliberate objective of inducing a medical or mental breakdown prior to any adjudication on the merits.

111. Defendants knew or should have known that their coordinated actions would cause Plaintiff severe emotional distress, particularly given his documented cognitive vulnerability and the repeated, explicit warnings provided to them by Plaintiff throughout the proceedings.

112. As a direct and proximate result of Defendants' intentional and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress, anxiety, trauma, and now homelessness and total lack of necessary medical care.

113. Defendants' actions were committed with the specific, subjective intent to cause this distress and to inflict a targeted, willful, and malicious injury to Plaintiff and Plaintiff's property rights, with an objective substantial certainty that such destructive results would occur.

114. Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial cumulative to any other remedies under this complaint.

115. As a result of the court in the Florida State Court Lawsuit in its July 29, 2026 order (Exhibit C-8) adjudging Defendant Smith as a converter and exploiter of a vulnerable adult who violated his fiduciary duties to Plaintiff while serving as Plaintiff's trustee, Plaintiff filed on July 30, 2026 a Motion for Partial Summary Judgement on Liability with respect to Counts II (Civil Theft) and VI (Intentional Infliction of Emotional Distress), a true and correct copy of

73

which is attached hereto as **Exhibit C-23**. Plaintiff has sought to have that motion heard at its earliest possible hearing date under the Florida Rules of Civil Procedure—September 18, 2026.

## ADDITIONAL RELIEF REQUESTED ACROSS ALL COUNTS

116. In addition to the relief requested within each count, Plaintiff also seeks entry of judgment against Defendants as follows:

    a.    Awarding injunctive relief as permitted by law or equity;

    b.    Awarding pre- and post-judgment interest on any amounts awarded; and

    c.    Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

117. Plaintiff, Steven Lewis Scesa, individually, and as Settlor and Sole Lifetime Beneficiary of the Steven Lewis Scesa Special Needs Trust dated February 11, 2021, hereby demands a trial by jury on all issues so triable.

Dated: July 31, 2026

_Steven Scesa_

Steven Scesa, Plaintiff
currently transient
Palm Beach County, FL
312-371-5297
stevenscesa@hotmail.com

# OATH OF VERIFICATION

**STATE OF FLORIDA**

**COUNTY OF PALM BEACH**

BEFORE ME, the undersigned authority, personally appeared STEVEN LEWIS SCESA, who, being first duly sworn, deposes and says that he is the Plaintiff in the foregoing action, that he has read the foregoing Verified Complaint, and that the factual allegations contained therein are true and correct to the best of his knowledge and belief.

_____
Steven Lewis Scesa, Plaintiff

Sworn to (or affirmed) and subscribed before me by means of physical presence with current, valid Florida driver's license produced this 31st day of July 2026 by Steven Lewis Scesa.

_____
Notary Public

Sate of Florida
County of Palm Beach

Subscribed and sworn to (or affirmed before me on this
31st day of ___July_____ 20 26.
by _STEVEN LEWIS SCESA_____
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _____

DELITA POWELL
Notary Public - State of Florida
Commission # HH 576738
My Comm. Expires Jul 29, 2028
Bonded through National Notary Assn.